# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARK HOUCK, RYAN-MARIE HOUCK, and RYAN-MARIE HOUCK ON BEHALF OF M.H., A.M.H., K.H., T.H., J.H., A.H., and I.H.,

Plaintiffs;

v.

UNITED STATES OF AMERICA; MICHAEL ROGERS, JUAN BARRIOS, JOHN DOE #1, STEPHEN CAPUTO, BRIAN CALABRESE, STEVE JOHNSON, JOHN DOE #2, JOHN DOE #3, ZACH BROSIUS, and JOHN DOE #4,

Defendants.

No. _____

## **COMPLAINT**

## I.  PRELIMINARY STATEMENT

1.     In September 2022, Mark Houck, a peaceful volunteer for a crisis pregnancy center in Center City Philadelphia and a 40 Days for Life prayer vigil participant, was indicted for two violations of the Freedom of Access to Clinic Entrances Act ("FACE Act"), 18 U.S.C. § 248.

2.     The charges were a result of a faulty and malicious investigation of Mr. Houck. Mr. Houck had been targeted for indictment without probable cause because of his beliefs, his public prayer and speech, and his position as a counselor associated with a crisis-pregnancy center.

3.     The Federal Bureau of Investigation's ("FBI") investigators portrayed Mr. Houck as a pro-life "protestor" who violently shoved an elderly Planned Parenthood escort because the escort was attempting to escort two patients and who intended to intimidate and interfere with the escort's objective of providing reproductive health services. This was false—knowingly false—in every respect.

4.     The FBI's investigators purposefully conducted a biased and corrupt investigation despite actual knowledge from all available evidence that their statements were false. The actions of the FBI's investigators were contrary to the Department of Justice's ("DOJ") public policy that the FACE Act "is not about abortions." Yet below the surface, the investigators' actions were fully in accord with extrajudicial statements of DOJ leadership that pro-life services are "fake" and "predatory" upon abortion rights.

5.     Federal officials' attack on Mr. Houck was not limited to the investigation, or even to Mr. Houck himself. Instead, they targeted the people in this world he loved the most. Before sunrise on September 23, 2022, an unsuspecting Mr. Houck had arisen early to begin making breakfast for his family.

Suddenly, the Houck home was swarmed by federal, state, and local agents in an act of overwhelming paramilitary force. In a shocking display of the political animus against the pro-life movement harbored at the highest levels of the Department of Justice, Mr. Houck was treated like a dangerous criminal. He was arrested at gunpoint in front of his wife and children.

6.      Mrs. Houck and her children were directly downrange from the agents' guns as Mrs. Houck frantically tried to find out what was happening to her husband, all while her children sat on the stairs, directly downrange, crying in fear.

7.      This egregious and excessive show of force was both unnecessary and unlawful. Mr. Houck is a peaceful man. He has never been convicted of any crime of violence or even owned a firearm, and was innocent of the non-violent federal charges against him, as a jury would unanimously conclude after Mr. Houck's trial a few months later.

8.      Mr. Houck, Mrs. Houck, and their children have deeply suffered because of the actions of state and municipal agents on September 23, 2022, in their unnecessary and unlawful show of force in storming the Houcks' homestead.

9.      State and municipal agents deprived Mr. Houck of his Fourth Amendment rights by using excessive force to arrest him on non-violent charges when he had not threatened law enforcement, did not own a gun, and had offered to turn himself into authorities if indicted.

10.     This action is also brought under the Federal Tort Claims Act for the torts of malicious prosecution, retaliatory prosecution, abuse of process, false arrest, assault, and intentional infliction of emotional distress committed by federal employees and agents against Mr. Houck, Mrs. Houck, and their children.

11.     This action seeks just compensation for the deprivation of Mr. Houck's, Mrs. Houck's, and their children's rights under the law.

## II.    JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. § 1343.

13.     On November 6, 2023, Administrative Tort Claims were submitted by all Plaintiffs to the United States Department of Justice. Six (6) months have passed since the filing of the administrative claims without action by the agencies. Plaintiffs have, therefore, exhausted all administrative remedies under 28 U.S.C. § 2675(a).

14.     Venue is properly within this District under 28 U.S.C. § 1391(b).

## III.   PARTIES

15.     Plaintiff Mark Houck is and was at all times relevant to this Complaint a resident of Bucks County, Pennsylvania.

16.     Plaintiff Ryan-Marie Houck is and was at all times relevant to this Complaint a resident of Bucks County, Pennsylvania.

17.     M.H. is the minor son of Mark and Ryan-Marie Houck.

18.     A.M.H. is the minor daughter of Mark and Ryan-Marie Houck.

19.     K.H. is the minor daughter of Mark and Ryan-Marie Houck.

20.     T.H. is the minor daughter of Mark and Ryan-Marie Houck.

21.     J.H is the minor son of Mark and Ryan-Marie Houck.

22.     A.H. is the minor son of Mark and Ryan-Marie Houck.

23.     I.H. is the minor daughter of Mark and Ryan-Marie Houck.

24.     Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act.

25.     Defendant Michael Rogers is a trooper in the Pennsylvania State Police who was acting under color of state law at all times relevant to this Complaint.  Upon information and belief, Defendant Rogers participated in the Houck arrest.  Defendant Rogers is sued in his individual capacity.

26.     Defendant Juan Barrios is a trooper in the Pennsylvania State Police who was acting under color of state law at all times relevant to this Complaint. Upon information and belief, Defendant Barrios participated in the Houck arrest. Defendant Barrios is sued in his individual capacity.

27.    Defendant John Doe #1 is a trooper in the Pennsylvania State Police who was acting under color of state law at all times relevant to this Complaint and whose actual name is unknown to Plaintiffs after having conducted a reasonable search with due diligence.  Upon information and belief, Defendant John Doe #1 participated in the Houck arrest.  Defendant John Doe #1 is sued in his individual capacity. Plaintiffs do not presently know the name of this Defendant but will seek leave to amend the Complaint so as to name each appropriate Defendant after the completion of additional discovery.

28.    Defendant Stephen Caputo is an officer in the Philadelphia Police Department who was acting under color of state law at all times relevant to this Complaint.  Upon information and belief, Defendant Caputo participated in the Houck arrest.  Defendant Caputo is sued in his individual capacity.

29.    Defendant Brian Calabrese is an officer in the Philadelphia Police Department who was acting under color of state law at all times relevant to this Complaint.  Upon information and belief, Defendant Calabrese participated in the Houck arrest. Defendant Calabrese is sued in his individual capacity.

30.    Defendant Steve Johnson is an officer in the Philadelphia Police Department who was acting under color of state law at all times relevant to this Complaint.  Upon information and belief, Defendant Johnson participated in the Houck arrest.  Defendant Johnson is sued in his individual capacity.

31.     Defendant John Doe #2 is an officer in the Philadelphia Police Department who was acting under color of state law at all times relevant to this Complaint and whose actual name is unknown to Plaintiffs after having conducted a reasonable search with due diligence.  Upon information and belief, Defendant John Doe #2 participated in the Houck arrest.  Defendant John Doe #2 is sued in his individual capacity. Plaintiffs do not presently know the name of this Defendant but will seek leave to amend the Complaint so as to name each appropriate Defendant after the completion of additional discovery.

32.     Defendant John Doe #3 is a Deputy Sheriff in the Bucks County Sheriff's Office who was acting under color of state law at all times relevant to this Complaint and whose actual name is unknown to Plaintiffs after having conducted a reasonable search with due diligence.  Upon information and belief, Defendant John Doe #3 participated in the Houck arrest.  Defendant John Doe #3 is sued in his individual capacity. Plaintiffs do not presently know the name of this Defendant but will seek leave to amend the Complaint so as to name each appropriate Defendant after the completion of additional discovery.

33.     Defendant Zach Brosius is an officer in the Middletown Police Department who was acting under color of state law at all times relevant to this Complaint.  Upon information and belief, Defendant Brosius participated in the Houck arrest.  Defendant Brosius is sued in his individual capacity.

34.     Defendant John Doe #4 is an officer in the Middletown Police Department who was acting under color of state law at all times relevant to this Complaint and whose actual name is unknown to Plaintiffs after having conducted a reasonable search with due diligence.  Upon information and belief, Defendant John Doe #4 participated in the Houck arrest.  Defendant John Doe #4 is sued in his individual capacity. Plaintiffs do not presently know the name of this Defendant but will seek leave to amend the Complaint so as to name each appropriate Defendant after the completion of additional discovery.

## IV.   FACTUAL ALLEGATIONS

### A.   Mark Houck maintains a history of peaceful pro-life activity.

35.     Mark Houck is a devout Catholic, author, lecturer, and pro-life activist who has deeply held convictions regarding the sanctity of unborn human life.

36.     For years, Mr. Houck has volunteered as a counselor referring and physically escorting women to the crisis pregnancy center, the Community Women's Center of America ("CWCA"), slightly down the street from the Elizabeth Blackwell Health Center at 1144 Locust Street in Philadelphia, Pennsylvania ("Planned Parenthood"), as well as participating with the local 40 Days for Life prayer vigil at that location and others for over 20 years.

37.     While volunteering Mr. Houck also adheres to his deeply held religious beliefs by praying for each pregnant woman and the children in her

womb. Among other things, Mr. Houck asks God to provide wisdom, comfort, and health to the women and health and safety to their children.

38.     Mr. Houck routinely conducts sidewalk counseling with 40 Days for Life, in which he compassionately engages with pregnant women and their male partners to invite them to consider alternatives to abortion.

39.     40 Days for Life conducts peaceful, prayerful, lawful vigils as indicated by its Statement of Peace, to which Mr. Houck adheres.

40.     Mr. Houck is often joined in the vigil by members of his family, most frequently by his oldest son.

41.     Mr. Houck does not protest at the Planned Parenthood facility and has never taken any action to block access to the facility. His activities are limited to counseling pregnant women in crisis, referring them to CWCA, and praying.

42.     In 2012, the Pro-Life Union established the CWCA, which is a pro-life center that offers pregnancy-related services, in Center City Philadelphia. The entrance to CWCA is across and slightly down the street from the Planned Parenthood abortion clinic.

43.     As a crisis pregnancy center that offers pregnancy-related services, the CWCA presents pregnant women with alternatives to abortion, giving them the opportunity to make fully informed decisions about their pregnancies.

44.     The CWCA is a certified reproductive health services facility and long-time member of the Pro-Life Union of Greater Philadelphia.

45.     The CWCA is staffed by trained professionals who provide pregnancy testing, ultra-sounds, and counseling for pregnant women and their partners.

46.     Over the years as part of his volunteer work, Mr. Houck has worked with the CWCA and routinely conducted sidewalk counseling, in which he compassionately engages with pregnant women and their partners and, if they desire, escorts them to the CWCA to receive reproductive health services.

47.     Mr. Houck has escorted many women into the CWCA facility and assisted them in receiving reproductive health care services from the trained and professionally credentialed staff within the facility.

48.     Mr. Houck and his family have saved an estimated 100 lives due to their peaceful activity outside the Planned Parenthood abortion facility on Locust Street and Mr. Houck's work with the professional staff at the CWCA to counsel and escort patients to the CWCA, all of whom have received reproductive health care services from the facility.

49.     Mr. Houck's work as a counselor and escort frequently involves him physically escorting women into the CWCA facility and waiting with them until a CWCA staffer begins the intake process. On at least one occasion Mr. Houck has

escorted a woman to CWCA where she received counseling and then further escorted her to a local hospital to receive treatment for an acute medical condition.

**B.     The first October 13, 2021, incident occurs.**

50.     On October 13, 2021, Mr. Houck had multiple encounters with Bruce Love ("Mr. Love"), a Planned Parenthood "escort," outside of the Planned Parenthood abortion facility on Locust Street.

51.     Mr. Houck was working as a counselor and escort for CWCA. He was also praying and holding a vigil with his son.

52.     At the same time, Mr. Love was at the entrance to Planned Parenthood where he was supposed to be acting as a volunteer escort in accordance with Planned Parenthood's policies and procedures.

53.     Mr. Love was a long-time Planned Parenthood "escort" who had many previous interactions with Mr. Houck and other pro-life counselors and escorts.

54.     At all times relevant hereto, Mr. Love was aware that Planned Parenthood had a policy which prohibited pro-choice escorts from "engaging" or "antagonizing" pro-life counselors like Mr. Houck.

55.     Mr. Love had wrongfully harassed pro-life counselors in the past in violation of that policy, and Mr. Love had previously been instructed by Planned Parenthood management on numerous occasions to stop doing so.

56.     Mr. Love's long history of antagonizing pro-life counselors prior to his interaction with Mr. Houck on October 13, 2021, was information readily available to the FBI.

57.     October 13, 2021, was no different. That day, like many before it, Mr. Love decided to ignore the Planned Parenthood policy and accost pro-life counselors. His chosen targets of the day were Mr. Houck and his 12-year-old son.

58.     At the time, Mr. Houck and Mr. Love both knew of the other's volunteer activities. They were both repeat volunteers for their respective reproductive healthcare facilities during the same time frames in the same city block for several years.

59.     Mr. Love was well aware that Mr. Houck was serving as a volunteer in connection with the CWCA on October 13, 2021.

60.     As counselors and escorts associated with reproductive healthcare facilities, both Mr. Houck and Mr. Love were entitled to the protections of the FACE Act, 18 U.S.C. § 248, because they were providing or attempting to provide access to reproductive healthcare services.

61.     In part, the FACE Act prohibits injuring or intimidating an individual "in order to" interfere with one's ability to obtain or provide reproductive health services. 18 U.S.C. § 248(a)(1).

62.     The first encounter, on October 13, 2021 (the "First Incident") began when Mr. Houck—alongside his 12-year-old son, M.H.—approached two women standing on the same street corner as themselves and began to explain the reproductive health services available at the CWCA. This conversation began like the many other conversations Mr. Houck had previously had with women during his years as a volunteer, where he provided information and referrals to the CWCA.  Mr. Houck's interaction with the women was similar to previous occasions during which he had shared a CWCA brochure describing the available reproductive healthcare services, answered questions, escorted women to the facility to connect them with a healthcare professional, and assisted them in receiving pregnancy-related services.

63.     Only this time, when Mr. Love saw Mr. Houck talking to the two women and showing them a CWCA brochure, Mr. Love ran nearly 100 feet to where Mr. Houck and the two women were talking. Mr. Houck and the women were located approximately 20 feet from the CWCA entrance.

64.     Mr. Love forced himself into the group, physically positioning himself between Mr. Houck and the women as they walked. Mr. Love tried to set a moving pick, separate Mr. Houck from them, and interrupt Mr. Houck's counseling and referral to the CWCA.

65.    Mr. Houck, in an effort to continue counseling the two women as they slid by Mr. Love's pick, made brief and inadvertent contact with Mr. Love's arm. Mr. Love's quick interjection and proximity prevented Mr. Houck from avoiding contact with Mr. Love.

66.    During cross examination at Mr. Houck's criminal trial, Mr. Love admitted that his "intent" when he approached Mr. Houck and the two women was in order to prevent him from referring the women to the CWCA crisis pregnancy center:

> Q. "Well, didn't you tell the FBI that the reason that you went up there was because you didn't want Mark to direct them to the woman's center across the street? That's what you told the FBI."
>
> A. "That's part of it, yes."

(*United States v. Houck*, Trial Transcript Day 3, Page 108 Line 10-14).

67.    Mr. Love's effort on October 13, 2021, to interfere with and disturb Mr. Houck's work as a counselor and escort were successful because he physically blocked Mr. Houck from speaking to the women. The women departed the area without receiving information or access to the CWCA crisis pregnancy center.

68.    The First Incident was a violation of the FACE Act by Mr. Love, not Mr. Houck. Yet Mr. Love was not charged, and Mr. Houck was.

69.     Despite the presence of multiple cameras, including police cameras and cameras on adjacent buildings in the vicinity of Mr. Love's interference with Mr. Houck, Planned Parenthood failed to preserve—and the FBI failed to collect—any video of Mr. Love interfering with Mr. Houck's work as a counselor and escort to the CWCA.

70.     This failure was especially egregious because Planned Parenthood's video system was on a "30-day loop." Planned Parenthood only saved and turned over a minute and a half of video surveillance depicting the second incident (discussed below) in which Mr. Houck pushed Mr. Love to keep Mr. Love away from his son, M.H. (*United States v. Houck*, Trial Transcript Day 2, Page 169 Line 15-22).

71.     When the FBI requested additional video, Planned Parenthood reported that the remainder of the video had been deleted. (*United States v. Houck*, Trial Transcript Day 2, Page 170 Line 19-23). The FBI was notified of the second incident on October 15, 2021, which was well within Planned Parenthood's 30-day video surveillance retention policy. The FBI had ample time to either collect additional footage or require Planned Parenthood to retain additional footage. The FBI failed to take these critical measures despite the FBI being specifically notified that the surveillance video was being provided to the FBI for a potential FACE Act violation. (*United States v. Houck*, Trial Transcript Day 2, Page 136 Line 14-16).

72.     Mr. Love's conduct in physically interfering with Mr. Houck's work on behalf of a crisis pregnancy center (the CWCA) was a clear violation of the FACE Act, 18 U.S.C. § 248, because he was intentionally using a physical obstruction (his body) to interfere with an individual attempting to provide access to pregnancy-related services.

73.     In short, with respect to the First Incident, federal law enforcement and the DOJ, acting in their official capacity and under color of law, knowingly and intentionally chose not to charge Mr. Love for his clear FACE Act violations, despite his history of antagonism toward pro-life volunteers and Mr. Houck and his son on October 13, 2021, but rather unjustly chose to charge Mr. Houck with a FACE Act crime that he clearly did not commit. This selective prosecution had a substantial effect on Mr. Houck's second charge, enhancing the potential maximum penalty from three years to eleven years, as a predicate or prior offense.

**C.     The second October 13, 2021, incident occurs.**

74.     Mr. Houck told Mr. Love that he disapproved of Mr. Love's interference with his attempt to counsel the two women. Mr. Love responded not by apologizing, but by berating Mr. Houck for offering such services in the first place. He then retreated into the Planned Parenthood abortion facility.

75.     Mr. Houck and his oldest son, M.H., then moved to a position approximately 50 feet away from the Planned Parenthood abortion facility's

entrance at the corner of 12th Street and Locust Street. They began to pray and talk to each other while waiting to speak to or counsel any individuals who might approach from that direction. Meanwhile, Mr. Love reemerged from the Planned Parenthood abortion clinic to man the entrance, his usual post.

76.     Mr. Love did not stay at his post for long. Perhaps encouraged by his success in blocking access to the CWCA in the First Incident and motivated by the presence of Mr. Houck's son, M.H., he once again left his post and instigated the "Second Incident" of the day. Mr. Love walked up Locust Street toward Mr. Houck and M.H. on the corner while loudly harassing them. Mr. Love refused to stop despite multiple requests by Mr. Houck.

77.     On multiple prior occasions, Mr. Love had harassed Mr. Houck while Mr. Houck had attempted to counsel young women and stand vigil. On previous occasions, Mr. Love had called Mr. Houck a "f----tt," a derogatory name for homosexuals, and grotesquely told Mr. Houck to "go home and masturbate" or to go back to his friends "the pedophile priests."

78.     Planned Parenthood was aware of Mr. Love's history of harassment, and this information was readily available to the FBI.

79.     On the date of this incident, Mr. Love made similarly abusive comments directed at Mr. Houck, but then intentionally escalated the harassment by directing his comments to Mr. Houck's 12-year-old son, M.H.

80.   Mr. Love—while standing only feet away from Mr. Houck and M.H.—began speaking directly to M.H. telling him his father was a "bad man that does not like women" and other harassing and abusive comments.

81.   At least one other person who witnessed the interaction urged Mr. Love to move back to his position at Planned Parenthood and leave Mr. Houck and M.H. alone.

82.   Mr. Love ignored these pleas and instead continued to bait and harass Mr. Houck.

83.   Mr. Love's intent was obvious: to drive Mr. Houck and M.H. away from the corner and to prevent them from continuing Mr. Houck's work as a counselor on behalf of the CWCA.

84.   At the time Mr. Love began to escalate his harassment of Mr. Houck and M.H., no facility patients or individuals were being counseled by Mr. Houck, M.H, or Mr. Love. No facility patients were nearby or in need of an escort.  The encounter (the "Second Incident") did not in any way involve any person's access to a reproductive clinic.

85.   During this lull in activity, Mr. Houck decided to defuse the situation and protect M.H. from Mr. Love's abusive and threatening conduct. Mr. Houck again asked Mr. Love to leave, and Mr. Houck first attempted to walk Mr. Love

from M.H. on the corner and back to Mr. Love's post at the entrance of the Planned Parenthood abortion facility on Locust Street.

86.    This de-escalation seemed to initially work, and Mr. Love appeared to comply with Mr. Houck's request to leave them alone. Mr. Houck therefore turned back toward his son on the corner. At that very moment, however, Mr. Love reversed course and headed back toward M.H., resuming his verbal harassment.

87.    At this, Mr. Houck turned around and, finding Mr. Love advancing toward him, pushed Mr. Love to protect M.H.

88.    When Mr. Houck finally pushed Mr. Love, he was pushing him away from the corner where he and M.H. were standing in order to stop Mr. Love's harassment of his child.

89.    The Planned Parenthood video reviewed by the FBI has no audio, but it shows that Mr. Love and Mr. Houck were arguing at the time of the shove and that M.H. was about three (3) feet behind Mr. Houck on the corner.

90.    The FBI interviewed Mr. Love and two (2) eyewitnesses who all verified that Mr. Houck mentioned his "son" at the time of the shove.

91.    Mr. Love himself told the FBI that at the time of the shove Mr. Houck told Mr. Love to "stay away from me, and away from my son." (*United States v. Mark Houck*, Trial Transcript, Day 3, Page 120 Line 19-25 and Page 121 Line 1-8).

92.     Eyewitness Ellen Weiss also testified while reviewing the video during her trial testimony that she recalled Mr. Houck "yelling something about his son." (*United States v. Houck*, Trial Transcript, Day 3, Page 177, Line 20-25, Page 178 Line 1 and Page 194 Line 11-17).

93.     Eyewitness Steven Jeronimo testified that at the time he heard Mr. Houck yelling that he heard "mention of a kid." (*United States v. Houck*, Trial Transcript, Day 3, Page 232 Line 3-6).

94.     A third eyewitness, Tristan Dahn, testified at trial and told the FBI that he heard "angry" shouting from Mr. Houck and that there may have been a child with Mr. Houck as he walked away. (*United States v. Houck*, Trial Transcript, Page 201 Line 19-20 and Page 210 Line 11-22).

95.     Prior to the filing of the indictment, there was sufficient evidence which showed that Mr. Houck acted to defend M.H., not to interfere with Mr. Love's work as a volunteer.

96.     There were no "patients" or prospective "patients" of the abortion facility present or nearby. The parties' brief encounter did not involve any person's access to the facility. Mr. Love was not escorting anyone or assisting anyone in obtaining reproductive health services. None of the parties, the Houcks included,

were so much as talking with a patient, or even preparing to talk with an approaching patient.

97.    Instead, Mr. Love unilaterally initiated an argument in an attempt to threaten and antagonize Mr. Houck and M.H. after having scored what he viewed as an initial victory in blocking women's access to the CWCA in the First Incident.

98.    Mr. Love's conduct was therefore motivated by, and for the express purpose of interfering with, Mr. Houck's work for the CWCA.

99.    Mr. Love's conduct was also in direct violation of Planned Parenthood policies governing volunteers. Those policies were promulgated at least in part to keep Planned Parenthood volunteers from violating the FACE Act. Specifically, the Planned Parenthood escort training manual dictates that it is "unacceptable behavior" for an escort to "engage with or antagonize" pro-life advocates including "sidewalk counselors."

100.    Mr. Love had received this training and had previously been reprimanded for violating this edict.

101.    At the criminal trial of Mr. Houck, Dayle Steinberg ("Ms. Steinberg"), the President and Chief Executive Officer of Planned Parenthood of Southeastern Pennsylvania, acknowledged that Mr. Love had "been spoken to on numerous occasions" about the "non-engagement policy and he continues to disregard it." (*United States v. Houck*, Trial Transcript Day 2, Page 104, Line 13-20).

102.   Ms. Steinberg further acknowledged that she had directed that Mr. Love be removed from the volunteer scheduled rotation. (*Id*.).

103.   Ms. Steinberg had memorialized these statements in an email to the Planned Parenthood Chief of Security shortly after the incident. This email, which discussed Mr. Love's history and repeated violations of Planned Parenthood's policies that specifically required him to avoid antagonizing pro-life counselors in light of the FACE Act, was available to the FBI prior to the Grand Jury Indictment of Mr. Houck.

**D.     State authorities decline to prosecute Mr. Houck.**

104.   After the Second Incident, Mr. Houck and M.H. left the area but later returned and provided officers of the Philadelphia Police Department Civil Affairs Unit ("PPCAU") a full statement describing both encounters including Mr. Love's violation of the FACE Act.

105.   After interviewing Mr. Houck and Mr. Love, the Philadelphia Police Department declined to pursue the incident further.

106.   A week later on October 20, 2021, Mr. Love filed a private criminal complaint against Mr. Houck in Pennsylvania state court relating to the October 13, 2021, incident in which he identified himself as a "volunteer" for Planned Parenthood and Mr. Houck as a "member of the Kingsman organization."

107.   In the complaint, Mr. Love made two false statements: first that he was positioned on the corner near Mr. Houck "waiting for clients" and second that he had been pushed in the back while he was "walking away."

108.   Upon information and belief, Mr. Love was assisted in filing the complaint, and it was drafted by a Planned Parenthood attorney notwithstanding Planned Parenthood's own concerns about Mr. Love's violation of Planned Parenthood policy.

109.   Mr. Love and Planned Parenthood had seven (7) days prior to filing the private criminal complaint to review the video footage and were at all times aware that Mr. Houck had not pushed Mr. Love in the back, despite Mr. Love's testimony claiming such.

110.   The FBI's investigative officer, including Special Agent Christopher Jackson, had access to this false complaint as early as October 21, 2021.

111.   Presumably at the direction of the FBI and federal authorities, the Philadelphia District Attorney did not bring charges against Mr. Houck relating to the incidents that occurred October 13, 2021 (the "Incidents") and did not pursue the private criminal complaint.

112.   The Philadelphia District Attorney spokesman publicly stated at the time of Mr. Houck's arrest that "[t]he case was disposed of locally so the DOJ could assume and lead the investigation." Jo Ciavaglia, *FBI Denies Anti-Abortion*

*Activists Claims that SWAT Force Was Used in Arrest at Upper Bucks Home*, The

Morning Call (Sept. 27, 2022), https://www.mcall.com/2022/09/27/fbi-denies-anti-

abortion-activists-claims-that-swat-force-was-used-in-arrest-at-upper-bucks-home/.

113.   The District Attorney's statement confirms that federal investigative

and/or law enforcement officers were aware that Mr. Love's complaint contained

false allegations and that the federal officers, nonetheless, communicated directly

with the state authorities about not pursuing the private criminal complaint so the

DOJ could pursue a Federal Indictment.

114.   Mr. Love did his part and purposely failed to appear for trial. The

state court dismissed Mr. Love's complaint on April 25, 2022, for his failure to

appear and prosecute his case.

**E.     The FBI arbitrarily enforces the FACE Act.**

115.   The FBI's investigative officers, including Special Agent Christopher

Jackson and other unnamed individuals, understood at the time of their

investigation of Mr. Houck they were serving a malicious and illegitimate purpose

in facilitating the prosecution of Mr. Houck, while ignoring Mr. Love's violations

of the FACE Act.

116.   The FBI knew that the FACE Act was rarely used to protect

counselors associated with crisis pregnancy centers—pro-life centers that offer

pregnancy-related services—but instead was used almost exclusively to prosecute

24

alleged victims associated with Planned Parenthood and other pro-choice organizations.

117.   FACE Act prosecutions are overseen by the DOJ Civil Rights Division.

118.   The target letter issued to Mr. Houck was signed by a local Assistant U.S. Attorney ("AUSA") in the Eastern District of Pennsylvania.

119.   There is no record of any prosecution of an individual violating the FACE Act by intimidating or interfering with a volunteer or employee of a crisis pregnancy center.

120.   In fact, the DOJ publicizes on its website the number of FACE Act prosecutions it has conducted.

121.   The most recent data shows that almost all of the publicized prosecutions were of pro-life advocates, not pro-choice ones.

| Prosecution of Pro-Life Defendant | Prosecution of Pro-Choice Defendant |
| --- | --- |
| *United States v. Zastrow, et al.* (2023) | *United States v. Freestone, et al.* (2023) |
| *United States v. Gallagher, et al.* (2022) | |
| *United States v. Handy, et al.* (2022) | |
| *United States v. Barron* (2022) | |
| *United States v. Moscinski* (2022) | |
| *United States v. Houck* (2022) | |
| *United States v. Kruse* (2022) | |
| *United States v. Chamberlin* (2022) | |
| *United States v. Brime* (2021) | |
| *United States v. Little* (2021) | |
| *United States v. Gulick* (2021) | |
| *United States v. Allen* (2020) | |

| *United States v. Dear* (2019) | |
| *United States v. Kaster* (2019) | |
| *United States v. Wiersma* (2019) | |
| *United States v. Reynolds* (2016) | |
| *United States v. Harris* (2017) | |
| *United States v. Curell* (2014) | |
| *United States v. Grady* (2012) | |
| *United States v. Mower* (2011) | |

Dept. of Justice, *Recent Cases on Violence Against Reproductive Health Care Providers* (updated May 30, 2023), https://www.justice.gov/crt/recent-cases-violence-against-reproductive-health-care-providers. The DOJ list still includes Mark Houck despite his acquittal on all charges.

122.   The single publicized prosecution of a pro-choice advocate involved vandalism of a pregnancy resource center.

123.   There are no cases involving the prosecution of an individual like Mr. Love who interfered with the work of a counselor working with a crisis pregnancy center—a pro-life center that offers pregnancy-related services.

124.   These disparities and the reasons behind them were well known to the FBI.

125.   The head of the DOJ Civil Rights Division, Kristen Clarke, has publicly declared that counselors and crisis pregnancy centers are not entitled to the protections of the FACE Act.

126.   In 2018, the United States Supreme Court issued an opinion in
*National Institute of Family Life Advocates v. Becerra*, which upheld the First
Amendment rights of crisis pregnancy centers. 138 S. Ct. 2361 (2018).

127.   At the time this decision was issued Ms. Clarke was the President and
Executive Director of the Lawyer's Committee on Civil Rights.

128.   The Lawyer's Committee and Ms. Clarke condemned the court's
ruling referring to crisis pregnancy centers as "fake clinics":

> "Make no mistake, today's decision at the #SCOTUS striking down a CA
> disclosure requirement for crisis pregnancy centers is part of a coordinated
> strategy to tear down #RoevWade. The anti-choice movement will stop at
> nothing. #EndTheLied #ExposeFakeClincs."

@KristenClarkJD, X (Jun. 26, 2018, 12:14 PM),
https://twitter.com/kristenclarkejd/status/1011658850498273280.

129.   Ms. Clarke further expressed her personal opinion on social media
where she described crisis pregnancy centers like the CWCA as "predatory":

> "Today's #SCOTUS ruling striking down CA law that required crisis
> pregnancy centers to provide factual information about state-offered
> services, including abortions, will have harmful consequences for
> women, especially women of color who are often targeted by predatory
> CPCs [Crisis Pregnancy Centers]."

27

@KristenClarkJD, X (Jun. 26, 2018, 10:29 AM),

https://twitter.com/KristenClarkeJD/status/1011632487129407488.

130.    Ms. Clarke took over the Civil Rights Division in May 2021, five (5)

months before the incident that led to Mr. Houck's arrest.

131.    Upon information and belief, her opinions on the biased enforcement

of the FACE Act are well known as a result of her confirmation testimony and

previous public statements.

132.    Upon information and belief, Ms. Clarke directly reported at all

relevant times to Associate Attorney General Vanita Gupta, the third-highest

ranking official in the DOJ. Like Ms. Clarke, Ms. Gupta has attacked crisis

pregnancy centers.

133.    In 2020, Ms. Gupta criticized a judicial nominee for serving as

president and legal counsel of a "so-called crisis pregnancy center." Letter from

Vanita Gupta to Oppose the Confirmation of David Dugan to the U.S. District

Court for the Southern District of Illinois, July 29, 2020, at 1, at

http://civilrightsdocs.info/pdf/policy/letters/2020/David-Dugan-Opposition-Letter-

SDIL-7.29.20-FINAL.pdf. Ms. Gupta then quoted the National Association for the

Repeal of Abortion Laws, also known as NARAL Pro-Choice America, to

disparage crisis pregnancy centers as "fake health-care clinics that lie to, shame

and intentionally mislead women about their reproductive-health-care options to block them from accessing abortion care." *Id*. at 2.

134.   Ms. Gupta took office as Associate Attorney General in April 2021, six months before the Incidents that led to Mr. Houck's arrest and served until February 2024. During her time in office, Ms. Gupta's public comments on the FACE Act reflected her belief that the ACT only applies to prosecute pro-life individuals.

135.   After the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), the DOJ established a "Reproductive Rights Task Force" led by Ms. Gupta. In July 2022—just two months before Mr. Houck's arrest—Ms. Gupta announced that the Task Force was "supporting the Department's ongoing work to enforce the FACE Act, which establishes criminal and civil penalties for injuring, intimidating or interfering with a person seeking to obtain or provide reproductive health services." Department of Justice, *Associate Attorney General Vanita Gupta Delivers Remarks at White House Convening of Lawyers in Defense of Reproductive Rights* (July 29, 2022), https://www.justice.gov/opa/speech/associate-attorney-general-vanita-gupta-delivers-remarks-white-house-convening-lawyers.

136.   In December 2022, Ms. Gupta reported that the Supreme Court's decision in *Dobbs* "increase[ed] the urgency" of enforcing the FACE Act: "Earlier

this year, in *Dobbs v. Jackson Women's Health Organization*, the Supreme Court dealt a devastating blow to women throughout the country, taking away the constitutional right to abortion and increasing the urgency of our work, including enforcement of the FACE Act, to ensure continued lawful access to reproductive services." Department of Justice, *Associate Attorney General Vanita Gupta Delivers Remarks at the Civil Rights Division's 65th Anniversary* (Dec. 6, 2022), https://www.justice.gov/opa/speech/associate-attorney-general-vanita-gupta-delivers-remarks-civil-rights-divisions-65th.

137.   Ms. Gupta's remarks made clear her view that the FACE Act protects abortion clinics and proponents of abortion rights but not crisis pregnancy centers and pro-life individuals.

138.   Upon information and belief, the FBI's investigative officers were aware that Ms. Clarke and Ms. Gupta believed the FACE Act did not apply to "fake clinics" and should instead be used to prosecute pro-life individuals on behalf of alleged victims associated with pro-choice organizations. As such, the FBI's investigative officers have failed to prosecute FACE Act violations on behalf of alleged victims associated with crisis pregnancy centers—pro-life centers that offer pregnancy-related services.

139.   The FBI's officers acted contrary to the DOJ's stated policy of the FACE Act not being "about abortion" and instead acted in accordance with Ms.

Clarke's and Ms. Gupta's improper views when they intentionally investigated and indicted Mr. Houck because he was pro-life and declined to investigate and prosecute Mr. Love because he was pro-choice.

### F.    Federal authorities fail to communicate with Mr. Houck's attorney.

140.   On April 27, 2022, just two days after dismissal of Mr. Love's complaint, Mr. Houck received a letter notifying him that he was the target of a federal grand jury investigation concerning a violation of the FACE ACT, 18 U.S.C. § 248.  It was served personally on Mr. Houck while he was counseling in front of a clinic.

141.   The letter invited Mr. Houck's counsel to communicate with federal officials.

142.   In response, Mr. Houck's counsel repeatedly attempted to reach the AUSA who signed the target letter, in writing and by telephone.

143.   Neither the AUSA nor any other federal official responded to Mr. Houck's counsel so much as to acknowledge his communication.

144.   On June 9, 2022, Mr. Houck's counsel emailed the AUSA to explain why the Government should not charge Mr. Houck with a FACE Act violation. This explanation highlighted legal precedent demonstrating that in cases like Mr.

Houck's, where a physical altercation occurred that was wholly unmotivated by the volunteer's work, no FACE Act violation had occurred.

145.   In the event that the Government decided to move forward with charges, Mr. Houck's counsel additionally stated that he would "accept a summons on [his] client's behalf, rather [than] put Mr. Houck and his family through needless disruption."

146.   Months passed with no response to Mr. Houck's counsel's email or subsequent phone calls.

147.   Mr. Houck and his counsel had reason to believe that the Government had reconsidered its position after reviewing the law and facts. The FACE Act, after all, prohibits injuring or intimidating an individual "because that person is or has been" or "in order to intimidate" such person from obtaining or providing reproductive health services. 18 U.S.C. § 248(a)(1).

148.   Shortly after Mr. Houck's counsel's letter, on June 24, 2022, the United States Supreme Court handed down *Dobbs*, which reversed *Roe v. Wade*. Mr. Houck's counsel did not receive a response from the AUSA until after Mr. Houck had been arrested on September 23, 2022.

149.   Under Ms. Gupta's and Ms. Clarke's leadership, and at the instigation of FBI agents who by this point had the true facts, a federal grand jury was convened.

150.    On September 20, 2022, a federal grand jury charged Mr. Houck with two violations of the FACE Act, with one count against Mr. Houck for each of the two incidents that occurred on October 13, 2021 (the "Indictment").

151.    Upon information and belief, no investigation was ever conducted regarding Mr. Love for violating the FACE Act with respect to either Incident.

152.    With respect to the First Incident, this failure to investigate Mr. Love was despite his admission that he had intentionally interfered with Mr. Houck while Mr. Houck was acting as a counselor for the crisis pregnancy center.

153.    The first paragraph of the Indictment introduces and identifies "Planned Parenthood – Elizabeth Blackwell Health Center" as a "provider of women's reproductive health services. . ." The Indictment makes no mention of the CWCA directly across the street from Planned Parenthood or Mr. Houck's work as a counselor and escort.

154.    Instead, the Indictment describes Mr. Houck as a "[p]rotestor." The alleged victim in the case was identified as Mr. Love, a Planned Parenthood volunteer escort who is described as an individual assisting patients in "safely entering and exiting the [Planned Parenthood] facility."

155.    This treatment is consistent with Ms. Gupta's and Ms. Clarke's widely known views that pro-life crisis pregnancy centers are "fake" and "predatory." On that view, anyone like Mr. Houck who prays, counsels, and assists in bringing

women to such pro-life centers can only be viewed as a "protestor" against Planned Parenthood, and not as someone engaged in conduct protected by the FACE Act.

156.   The FBI targeted Mr. Houck for indictment without probable cause because of his beliefs, his public prayer and speech, and the fact that he is a counselor associated with a crisis pregnancy center.

157.   The FBI personnel, including Special Agent Jackson, were all aware of the discriminatory policies and practices surrounding the enforcement of the FACE Act, and that the DOJ was targeting Mr. Houck and protecting Mr. Love in an effort to intimidate and disrupt the activities of pro-life counselors and pregnancy crisis centers.

158.   Count I of Mr. Houck's Indictment, which charged the First Incident, also contained egregious factual errors.

159.   For example, it completely reversed the facts and falsely alleged that Mr. Houck "shoved" a Planned Parenthood volunteer (Mr. Love) to the ground as the volunteer "attempted to escort two patients" into a reproductive health services facility. It further alleged that Mr. Houck did so in an effort to "*intimidate and interfere with*" the volunteer "*because*" the volunteer "*was or had been providing reproductive health services*." (emphasis added).

160.    The FBI intentionally ignored Mr. Love's admitted violation of the FACE Act presumably because Mr. Love is a counselor associated with Planned Parenthood, an organization that provides, and advocates for, abortions.

161.    Count I was patently false. It was also easily disproven by Mr. Love's own admissions.

162.    Count II, which charged the Second Incident, was also false. Mr. Houck did not push Mr. Love away "in order to" interfere with the reproductive health services of Planned Parenthood. When Mr. Love was pushed to the ground, he was not in the process of escorting anyone to receive any reproductive health services, nor was anyone speaking with potential patients or preparing to speak with potential patients.

163.    Rather, the push happened because Mr. Love had repeatedly left his station at the clinic entrance to accost Mr. Houck and his 12-year-old son with outrageous comments.

164.    All of the witnesses agreed that the physical altercation happened because Mr. Houck got "angry" and yelled for Mr. Love to "leave [him and] his son alone."

165.  Count II is also easily disproven by video surveillance, as Mr. Love was not escorting any patients into Planned Parenthood when the physical contact took place.

166.  The only way the false statements in the Indictment could have been adopted by the grand jury is by the malicious presentation of false or misleading facts and instructions or the concealment of critical and material information.

167.  Upon information and belief, FBI Special Agent Jackson and other agents participated and assisted in the presentation of evidence to the grand jury.

168.  This false and misleading information was presented to the grand jury for the sole purpose of obtaining an indictment to charge Mr. Houck. This effort was malicious and based on Mr. Houck's speech, prayer, and work as a counselor for a pro-life center that offers pregnancy-related services.

169.  This malice was also consistent with Ms. Gupta's and Ms. Clarke's view that not only are pro-life centers "fake" clinics unworthy of protection under the FACE Act, but also Ms. Clarke's view that anyone working on their behalf shares in their "predatory" mission and is therefore a prime subject for FACE Act prosecution.

170.   Mr. Love, on the other hand, was spared investigation, arrest, and prosecution because he was associated with Planned Parenthood, a pro-choice abortion clinic that offers pregnancy-related services.

171.   At all times relevant hereto, the FBI's investigative officers acted deliberately to fabricate probable cause in order to indict, arrest and charge Mr. Houck with a crime they knew he did not commit.

### G.   Mr. Houck is arrested at gunpoint in front of his family.

172.   The Government moved quickly after the Indictment, but it ignored Mr. Houck's counsel's offer to surrender their client.

173.   Instead, government agents opted for excessive and overwhelming force that resulted in unnecessary danger and fear.

174.   Early on the morning of September 23, 2022, Mr. Houck started breakfast on the main floor of his home while his wife dressed, and his seven children slept in their upstairs bedrooms.

175.   Suddenly, around 6:45 am, before daylight, Mr. Houck's quiet morning was abruptly interrupted with loud pounding on the front door, repeated ringing of the doorbell, and voices shouting to "Open up!" and "Hurry!"

176.   Before opening the door, Mr. Houck advised whoever was outside that he was going to open the door and to stay calm because he had seven babies inside.

177.    Mr. Houck opened the door to find a large cohort of heavily armed federal, state, and local law enforcement surrounding his home and pointing rifles and pistols directly at him.

178.    Upon information and belief, at least 20 law enforcement agents participated in Mr. Houck's arrest.  A senior FBI source has admitted that "there may have been 15-20 agents at the scene."  Bradford Betz et al., *Pennsylvania pro-life activist arrested by FBI, charged with assaulting clinic escort*, FOX NEWS (Sept. 25, 2022), https://www.foxnews.com/us/pennsylvania-pro-life-activist-arrested-fbi-charged-assaulting-clinic-escort. In addition to the federal agents, state and local law enforcement agents also participated in the arrest.

179.    Mr. Houck observed that the agents were wielding firearms, battering rams, a crowbar, and were equipped with heavily armored vests, ballistic helmets, and shields.  Marked and unmarked government vehicles surrounded his home and lined his driveway.

180.    Mr. Houck also observed rifles, including AR-styled rifles and handguns aimed at him from his porch, his yard, and his driveway. Agents crouched behind their vehicles and aimed their guns at him as if they were arresting a dangerous criminal.

181.    Two agents were in the rear of Mr. Houck's home and scared Mr. Houck's daughter, T.H., when she discovered agents dressed in black behind the

home. T.H. observed that the agents were holding rifles and were looking into the

Houcks' home through the back door windows.

182.   Mr. Houck asked why the agents were there, to which an agent

replied, "you know why we are here."

183.   No warrant was visible or provided.

184.   The show of force and attempts to intimidate and terrify Mr. Houck

were unnecessary, however, as he was at all times peaceful and complied with

agents' instructions without delay or question.

185.   Meanwhile, Mrs. Houck, confused to see flashing lights on her

bedroom walls, approached the upstairs window to observe the scene below.

186.   Mrs. Houck, with her bird's eye view, observed marked and

unmarked government vehicles surrounding her home. Mrs. Houck saw that every

officer present had a gun that was aimed directly at her house.

187.   Mrs. Houck rushed down the stairs, which are less than five feet from

the front door, to join her husband in front of the agents' pointed guns. The

officers' guns were pointed at her and followed her movements.

188.   Mrs. Houck immediately asked who the agents were looking for. An

agent initially refused to provide the name of the individual the cohort was

attempting to arrest, but after Mrs. Houck insisted, an agent eventually replied they

were there for Mark Houck.

189.   The Houck children had begun to scream, gathering on the stairs just behind the front door and downrange of the firearms pointed at their parents.

190.   In the several minutes that elapsed since Mr. Houck had stepped onto the front porch, the officers' guns remained pointed at him and followed his movements.

191.   Mr. Houck cooperated throughout the arrest.  He did not resist or attempt to evade arrest. Mr. Houck placed his hands in the air and slowly walked out his front door onto his porch. Nonetheless, the officers' guns remained pointed at him.

192.   Mr. Houck asked if he could get dressed. The officers refused his basic request.

193.   When Mrs. Houck demanded to know if the agents had a warrant for her husband's arrest, an agent responded that "we are taking him with or without a warrant."  Only later, after Mr. Houck had been handcuffed and loaded into the transport vehicle, did any agent produce a warrant to Mrs. Houck.

194.   Mr. Houck's oldest son, M.H. unsuccessfully attempted to shield his younger siblings from seeing their father arrested by armed agents.

195.   Mr. Houck's children stood on the stairs screaming, crying, and watching in terror as heavily armed agents hauled their father away.

196.    It was not until after the children had made their way down the stairs that the guns were put down and put away, but by then, the children had already been subjected to the raised guns and the forcible detention of their father.

197.    Mrs. Houck found it difficult to breathe as FBI agents surrounded her home with ballistic shields and loaded weapons.

198.    As Mr. Houck was arrested, Mrs. Houck was shaking in fear for the safety of herself, her husband, and her children who were all screaming and crying on the stairs.

199.    During transport, Mr. Houck asked the transporting officers, including Agent Jackson, the lead officer on the case, why so many agents were necessary in his arrest. The agent responded by claiming that they did not know anything about Mr. Houck and arguing that they always came "prepared for anything."

200.    But in fact, as noted above, the team would have learned from its preparation that Mr. Houck had no criminal history, that he had no history of violence, that his attorney had offered his voluntary surrender in the event of an indictment, and that Mr. Houck had no registered guns at all, let alone any guns in his home.

201.    Agent Jackson's comment was gaslighting, an effort at plausible deniability for his team's unnecessary and excessive force in detaining Mr. Houck.

202.    On September 23, 2022, nearly ten hours after the raid on his home, Mr. Houck was released on his own recognizance and reunited with his family. The FBI's chosen means of arrest allowed it to last a period of several hours during which Mr. Houck was chained to a desk and left alone in a room with no communication or information.

203.    Even after the federal law enforcement agents knew that Mr. Houck was to be released on his own recognizance, he was kept chained hand and foot until released. Again, this was precisely the treatment one would expect for those whom the DOJ's senior leadership viewed as aiding "fake" and "predatory" pro-life centers.

204.    Mr. Houck stood trial beginning on January 24, 2023.

205.    After a trial and deliberations that spanned five days, the jury acquitted Mr. Houck on all charges on January 30, 2023.

**H.    Defendants engaged in unlawful actions against Mr. Houck.**

206.    Upon information and belief, FBI's investigative officers participated in the investigation leading to Mr. Houck's subsequent indictment.

207.    Upon information and belief, the FBI's investigative officers intentionally, knowingly, and/or recklessly made or caused to be made false statements and representation and material omissions of facts in reports, affidavits, or other communications with federal prosecutors, thereby initiating a malicious

prosecution of Mr. Houck, as evidenced by false allegations made in the indictment.

208.    Upon information and belief, Defendants participated in Mr. Houck's arrest and were present at his home on September 23, 2022.

209.    Upon information and belief, Defendants had guns drawn and pointed at Mr. Houck during his arrest.

210.    Upon information and belief, the Defendants conspired and agreed before Mr. Houck's arrest to draw up their weapons and aim them at Mr. Houck. Based on what the Defendants knew or should have known about Mr. Houck, they knew or should have known that it would constitute excessive force to draw up their weapons and aim them at Mr. Houck.

211.    Each Defendant knew or should have known that Mr. Houck had been charged with non-violent crimes.

212.    Each Defendant knew or should have known that Mr. Houck did not pose an immediate threat to their safety or the safety of others during his arrest.

213.    Each Defendant knew or should have known that Mr. Houck had no criminal history or history of violence.

214.    Each Defendant knew or should have known that Mr. Houck had never threatened law enforcement officers.

215.    Each Defendant knew or should have known that Mr. Houck, his wife, and his children did not own a firearm.

216.    Each Defendant knew or should have known that Mr. Houck's wife and seven children lived with Mr. Houck and would be present during an arrest at the family home.

217.    At least one Defendant admitted awareness that Mr. Houck's children would be present.  As Mr. Houck was being arrested, the vehicle dashcam video captured one agent confiding to another: "My only concern, really, was the schools in the morning.  You saw the kids starting to come out."  The two agents discussed how Mr. Houck's kids could have been standing at the end of the driveway.  The second agent then exclaimed the obvious: "Yeah, I don't want any kid to see this s---."

218.    Each Defendant knew or should have known that the ratio of law enforcement agents to Mr. Houck clearly compelled a low level of force.

219.    Each Defendant knew or should have known that Mr. Houck was willing to and had offered to, through counsel, turn himself in if he was indicted.

220.    Each Defendant knew or should have known that Mr. Houck was represented by counsel all at relevant times during the arrest.

221.    At all times relevant to this Complaint, the conduct of Defendants was extreme and outrageous and was in willful, reckless, and callous disregard of the Plaintiffs' rights under federal and state law.

## I.    Defendants' unlawful actions resulted in significant damages to Plaintiffs.

Injuries to Mr. Houck

222.    As a direct and proximate result of the FBI's raid of Mr. and Mrs. Houck's home, as well as the FBI's investigation and false arrest of Mr. Houck and the resulting imprisonment and malicious prosecution of him, Mr. Houck suffered, and continues to suffer, substantial damages.

223.    Those damages include loss of liberty, invasion of privacy, substantial emotional distress and harm with physical manifestations, irreparable loss of reputation, infringement on his free exercise of religion and free speech rights, and post-traumatic stress.

224.    Mr. Houck incurred economic damages from cancelled speaking engagements and lost business opportunities due to these events, and from the need to install a security system in the family home after the arrests.

225.    Mr. Houck will also suffer future economic damages, as his professional reputation has been severely tarnished by the FBI's humiliating arrest and the DOJ's frivolous, malicious prosecution.

226.    Most tragically, Mr. Houck and his wife have lost three babies from miscarriages due to the stress of the FBI's conduct and resulting prosecution. The stress of these events was so severe that the Houcks have been diagnosed with infertility.

227.    Mr. Houck has suffered severe emotional distress since the day federal, state, and local agents raided his home without notice in the early hours of September 23, 2022. The raid violated his personal liberty in his home, a place where he felt responsible for his wife and his children as their family protector.

228.    Officers purposely surprised and shocked him with guns drawn and then humiliated him in front of his family. He was made to appear as a criminal to his wife and children. More importantly, the core of his identity as a father and family protector was violated in the most vivid way possible, seared into the memory of Mr. Houck and his loved ones.

229.    The FBI further degraded Mr. Houck during the booking period. Despite his total cooperation, the officers forced him to walk in chains and handcuffs to the U.S. Marshals Service. They used intimidation tactics throughout the booking process. As Mr. Houck was forced to shuffle along in his chains, the foot shackles dug into his ankles, leaving scrapes and cuts in his flesh.

230.     Officers placed Mr. Houck in a sterile, white room, still chained and shackled. There was little to no communication with attorneys or his terrified family for almost six hours.

231.     Those hours waiting to speak to and comfort his family over the phone were the most agonizing hours of Mr. Houck's life. He still carries deep-seated trauma from that memory.

232.     To this day, the mere recollection of that time emotionally triggers him.

233.     He is especially tormented by the thought of the mental anguish his family suffered while he was detained without any word from him.

234.     As he sat in the cell, all he could hear was the cry of his six-year-old son J.H. to the FBI agents, "Please don't take him, he is my best friend," and all he could see were the terrified eyes of his nine-year-old daughter T.H. as she looked into the face of an officer dressed in SWAT gear through the back window.

235.     Mr. Houck also suffered extreme stress from the time of the arrest until his acquittal four and half months later. He woke up every day in fear—fear that his family was not safe inside their own home, fear that his children were not safe even sleeping in their own beds, and fear that he may have to go to prison and leave his wife and seven children to fend for themselves.

236.    Since his acquittal, the emotional stress of these events has not ceased. Mr. Houck has suffered and continues to suffer from severe anxiety about the future. He is occupied with persistent worries about his ability to protect his family.

237.    After the arrest, he was so worried about the safety of his family members that he could not leave the home for even 15 to 30 minutes. His wife and children were equally concerned about Mr. Houck leaving the house.

238.    The family lived in a constant state of fear. Eventually they became prisoners in their home. Even today whenever either Mr. or Mrs. Houck leave the house, the children cling to them and express fears that their parents will not return. After all, when Mr. Houck left after his arrest, Mrs. Houck and the children had no idea when or if he would return.

239.    The simple act of leaving the home, even for a short amount of time, triggers that traumatic memory for the entire family.

240.    Mr. Houck also must cope with and comfort a family that lives in constant fear that someone will invade their home. To this day, panic ensues whenever visitors or guests arrive unannounced on the property. Mr. Houck feels a strong need to protect his family even from false threats, which has ultimately led them to install a gate at the entrance of their property and security cameras to feel more secure in their own home.

241.    The family's involvement in the community and in religious activities has also suffered, and they have withdrawn socially as a result of the arrest. The family no longer attends as many prayer vigils as they used to because these events are triggering for the children.

242.    The family worries whenever they see police officers or police vehicles and the Houcks no longer take the children on field trips to visit state trooper barracks due to the trauma from the invasion of their home.

243.    Mr. Houck has also suffered immensely in observing the effects that trauma and stress stemming from the arrest and subsequent trial have had on his children. Mr. Houck has spent many days consoling and crying with his wife and children.

244.    In the immediate aftermath of the arrest, all of the children suffered from severe sleeping problems and had to sleep with Mr. Houck and his wife for at least a month.

245.    The children continue to suffer from sleeping problems and all of them have some degree of sleep deprivation or nightmares.

246.    Mr. Houck regularly wakes up to his children crying from nightmares of the events, and his youngest son, A.H., now suffers from sleepwalking as a result.

247.    All of the children also suffer from anxiety, loss of joy, and deep sadness from this trauma, and they spend hours crying.

248.    Mr. Houck finds it important to be strong for them; however, carrying his own emotional burden alongside the grief and fear his wife and seven children experience has taken an enormous toll on Mr. Houck. He has been forced to deal not only with his own trauma but also with the trauma of everyone in his household.

249.    The publicity from these events has compounded the emotional distress Mr. Houck and his family have experienced.

250.    Mr. Houck and his wife have seen their dreams of having more children dashed and have lost three children due to these events. The raid of their home, the arrest, and the prosecution took such a toll on the mental and emotional health of the entire family that the couple had three miscarriages. Doctors attribute the loss of these babies to the stress of these events and have told the Houcks that they are now infertile as a result.

251.    Mr. and Mrs. Houck suffer immense grief and pain from these losses of life and this diagnosis.

252.    Mr. Houck also suffers from continual anxiety about his ability to provide a living for his family with this scarlet letter on his chest. Even though he did not go to prison, the damage of this prosecution on his professional prospects

and reputation are irreversible. Many of his professional and personal relationships have been forever ruined because individuals still believe the falsehoods spread by the Government in its charging documents and press releases.

253.    Mr. Houck also lost a significant amount of time doing his life's work that can never be regained due to the FBI's actions. From the time he was arrested until he was acquitted four and a half months later, he was prohibited from standing vigil at any abortion clinic.

254.    He previously devoted several hours a week to praying and counseling patients outside the clinic. This activity was more than volunteer work—he considered it his religious calling.

255.    The FBI's tortious actions stripped away his religious freedom to stand vigil outside any clinic and carry out his vocation. This infringement on his religious exercise, for any length of time, is irreparable.

256.    Mr. Houck also suffered significant economic damage from these events. This includes lost income from the time he was arrested on September 23, 2022, until he was acquitted on January 30, 2023, due to his time in jail, time spent preparing for trial, and reputational damage from the publicly humiliating arrest and malicious prosecution.

257.    Mr. Houck has lost multiple business opportunities even after he was acquitted on January 30, 2023. He was uninvited from speaking at various

conferences and other events due to the arrest and prosecution. He has suffered lost income from these speaking cancellations since the acquittal on January 30, 2023.

258.    Mr. Houck expects to continue to suffer economic damages from lost future speaking engagements that he would have obtained absent the arrest.

259.    Mr. Houck has also lost other volunteer ministry opportunities that would have led to compensable speaking engagements.

260.    Likewise, the travel limitations he faced from the time of the arrest until the end of trial significantly restricted his ability to obtain new donors and form partnerships with potential sponsors. Thus, Mr. Houck has lost sources of funding for his ministry that he would have otherwise obtained.

261.    These negative impacts on Mr. Houck's reputation were caused by the malicious indictment, arrest, and prosecution, all of which the FBI publicized in a press release that characterized Mr. Houck as perpetrating "violence" against a 72-year-old man "because" he was a volunteer.

262.    The press release falsely described Mr. Houck as targeting an individual based on his volunteer associations and committing a "federal crime" punishable by up to "11 years in prison."[1]

-------

[1] Ironically, the DOJ press release accused Mr. Houck of the exact conduct DOJ was engaging in when the DOJ targeted him for arrest and prosecution, *i.e.*, targeting Mr. Houck based on his beliefs and his volunteer association with a crisis pregnancy center.

263.    These false characterizations were repeated in multiple media outlets and were read by potentially millions of Mr. Houck's fellow citizens.

264.    Mr. Houck also incurred significant costs from this malicious arrest and prosecution.

a.    Injuries to Mrs. Houck and the Houck children

265.    As a direct and proximate result of the FBI's investigation and invasion of Mr. and Mrs. Houck's home, as well as the FBI's false arrest of Mr. Houck and the resulting imprisonment and malicious prosecution of him, Mrs. Houck suffered, and continues to suffer, substantial damages.

266.    Those damages include invasion of privacy, substantial emotional distress and harm with physical manifestations, and post-traumatic stress.

267.    Mrs. Houck carried her children's immense emotional trauma and physical manifestations of stress while her husband was away during his imprisonment and prosecution.

268.   Mrs. Houck has suffered severe emotional distress and physical manifestations of stress and post-traumatic stress since the day FBI agents raided her home without notice in the early hours of September 23, 2022.

269.    At the time of the raid, she was dressing and preparing to wake her children for breakfast. When the FBI surrounded and stormed her house with their

guns drawn in the early hours of the morning, they accosted her personal liberty in her home, a place where she thought she and her children were safe.

270.   Mrs. Houck saw officers swarm her husband with their guns pointed at him, and she rushed down the stairs to stand by his side at the end of several gun barrels. She heard her children crying and knew there was nothing she could do to protect them. Then officers led her husband away at gun point and in handcuffs to the car.

271.   Mrs. Houck had no idea when or if he would return. The rest of the day was agony as she waited to hear from Mr. Houck. And while she shouldered her own fears and questions, she had to stay strong for her seven children and care for them.

272.   Even after Mr. Houck returned home, the emotional trauma of that day continued to haunt Mrs. Houck; and the stress of the prosecution and the following months only made matters worse.

273.   Mrs. Houck has suffered from depression since the arrest. She struggles to sleep, and she has continual nightmares. She takes sleep medication just to get a few hours of sleep.

274.   Mrs. Houck spends hours crying and is often teary-eyed.

275.    She has continual, racing thoughts that someone is going to come to her house while she is sleeping. She has paranoia that people are following and watching her family and that the house is bugged.

276.    The public media attention has only made her condition worse. She now fears that since people know where she lives, they could bring additional harm to her and her family. With her mind always racing and occupied by these fears, she struggles to focus on daily tasks. This leads to more stress and a sense of feeling overwhelmed.

277.    The stress of these events has taken an immense toll on her body– such a significant toll that she had three miscarriages from stress. Doctors have now diagnosed her with infertility. Alongside the trauma, paranoia, and anxiety she has suffered, she now carries the grief of losing three children and the pain of infertility.

278.    Many things can trigger the emotional trauma of these events for her. When Mr. Houck first returned after his arrest, Mrs. Houck struggled to cope every time he left the house. Even trips of 15 to 30 minutes took an immense toll on her. After all, when he was arrested, she did not know when or if he would return. She still struggles with these fears.

279.     Unannounced guests or visitors also trigger an emotional response. She had a panic attack when a surprise visitor showed up at the home even though the person did not pose an actual threat.

280.     Mrs. Houck lives in a constant state of fear that someone will invade their home. This anxiety led the family to install a gate at the entrance of their property and security cameras to feel more secure.

281.     Mrs. Houck's involvement in the community and in religious activities has also suffered, and she has withdrawn socially as a result of the FBI and DOJ's actions.

282.     The family no longer attends as many prayer vigils as they used to because these events are triggering for the children.

283.     The family worries whenever they see police officers or vehicles. And the parents no longer take the children on field trips to visit state trooper barracks due to the trauma from the invasion of their home.

284.     Mrs. Houck has also shouldered the emotional distress of caring for her seven children and their individual needs as they each process their own trauma from these events.

285.     The children continually come to her crying and suffering from nightmares. The children slept in bed with her and her husband for the first month after the arrest, and they continue to ask to sleep in their parents' bed. The children

are easily triggered whenever the situation is brought up or unannounced guests arrive at the property and Mrs. Houck spends a significant amount of time counseling and comforting them.

286.    Based upon the foregoing allegations, Mrs. Houck now seeks to recover monetary damages due to the intentional infliction of emotional distress and assault committed by the DOJ and FBI.

287.    Mrs. Houck also brings intentional infliction of emotional distress claims on behalf of her children, who have suffered individual physical and emotional damage as a result of these events.

### i. Injuries to M.H.

288.    The oldest child, M.H, took on significant responsibilities in the household after his father's arrest and during the prosecution.

289.    He shouldered the emotional burdens of his mother and his younger siblings while trying to carry his own distress.

290.    M.H. suffers immense anxiety, which is only compounded by his continual sleep deprivation and nightmares from the stress. He has to take sleep medication to get a few hours of sleep.

291.    M.H. is triggered any time one of his parents tries to leave the house for fear that they will not return.

292.    He is also emotionally triggered any time unannounced guests show up at the house. Encounters with police officers and vehicles also spawn worry. His parents no longer take him to prayer vigils or certain field trips involving state troopers due to his trauma.

293.    For the emotional distress, medication, and physical impact of these events on M.H.'s sleep, health, and well-being, the Houcks seek to recover monetary damages.

### ii.  Injuries to A.M.H.

294.    The eldest daughter, A.M.H., is only eleven years old but has taken on an immense amount of stress in caring for her younger siblings in the aftermath of these events.

295.    She suffers from severe sleep deprivation and nightmares. She has to take sleep medication to get a few hours of sleep.

296.    For the first month after the arrest, she could only fall asleep in her parents' room.

297.    She is terrified any time one of her parents tries to leave the house for fear that they will not return.

298.    She is also emotionally triggered any time unannounced guests show up at the house.

299. Encounters with police officers and vehicles also spawn worry. Her parents no longer take her to prayer vigils or certain field trips involving state troopers due to her trauma.

300. A once happy eleven-year-old girl, she now carries a great deal of sadness from the trauma of these events.

301. For the emotional distress, medication, and physical impact of these events on A.M.H.'s sleep, health, and well-being, the Houcks seek to recover monetary damages.

### iii. Injuries to K.H.

302. K.H. is only ten years old and yet has experienced a severe loss of joy and deep sadness at her young age due to these events.

303. She suffers from severe anxiety and worry, and she still carries deep-seated fears that she will lose her father.

304. She continues to suffer from severe sleep deprivation and nightmares due to these events. She has to take sleep medication to get a few hours of sleep.

305. For the first month after the arrest, she could only fall asleep in her parents' room.

306. She is terrified any time one of her parents tries to leave the house for fear that they will not return.

307.   She is also emotionally triggered any time unannounced guests show up at the house.

308.   Encounters with police officers and vehicles also spawn worry.

309.   Her parents no longer take her to prayer vigils or certain field trips involving state troopers due to her trauma.

310.   For the emotional distress and physical impact of these events on K.H.'s sleep, health, and well-being, the Houcks seek to recover monetary damages.

### iv.   Injuries to T.H.

311.   T.H. is the most deeply traumatized of the children. Her preexisting struggles with anxiety and worry have immensely intensified in the aftermath of these events.

312.   At the time of the raid, when she was only nine years old, she witnessed SWAT personnel staring her down at the back door. This memory continues to haunt her to this day.

313.   She suffers from tremendous nightmares, never-ending poor sleep, and sleep deprivation due to the overwhelming stress of this situation.

314.   The trauma of the raid as well as the stress of the trial have taken an immense emotional toll on her.

315.   She has to take sleep medication to get a few hours of sleep.

316.   For the first month after the arrest, she could only fall asleep in her parents' room.

317.   She is terrified any time one of her parents tries to leave the house for fear that they will not return.

318.   She is also emotionally triggered any time unannounced guests show up at the house.

319.   Encounters with police officers and vehicles also spawn worry.

320.   Her parents no longer take her to prayer vigils or certain field trips involving state troopers due to her trauma.

321.   For the emotional distress and physical impact of these events on T.H.'s sleep, health, and well-being, the Houcks seek to recover monetary damages.

> *v.  Injuries to J.H.*

322.   J.H. was six years old at the time he saw his father taken away at gunpoint.

323.   He cried the entire time and yelled to the FBI, "Please don't take him he is my best friend."

324.   To this day, any time someone brings up the raid or tells the story, he starts to cry as if he is reliving the day all over again.

325.   J.H. consistently worries that he will lose his father or mother. And his sleep quality is just as bad as his siblings'. He has to take sleep medication, and for the first month after the arrest, he could only fall asleep in his parents' room.

326.   He is also emotionally triggered any time unannounced guests show up at the house.

327.   Encounters with police officers and vehicles also spawn worry.

328.   His parents no longer take him to prayer vigils or certain field trips involving state troopers due to this trauma.

329.   For the emotional distress and physical impact of these events on J.H.'s sleep, health, and well-being, the Houcks seek to recover monetary damages.

vi.   Injuries to A.H.

330.   A.H. is a four-year-old who was deeply impacted and traumatized by the raid and subsequent prosecution.

331.   While he cannot express in words the amount of worry and trauma he has suffered, he often shouts and cries for his parents.

332.   He has also started sleepwalking as a result of the stress.

333.   For the emotional distress and physical impact of these events on A.H.'s sleep, health, and well-being, the Houcks seek to recover monetary damages.

### vii.  Injuries to I.H.

334.  I.H. is a two-year-old who also carries deep-seated trauma from these events. Like her older siblings, she suffers from poor sleep and continual worry. For the emotional distress and physical impact of these events on I.H.'s sleep, health, and well-being, the Houcks seek to recover monetary damages.

## COUNT I
**Plaintiff Mark Houck v. Defendant United States of America**
**Federal Tort Claims Act – Malicious Prosecution**

335.  All preceding paragraphs are repleaded, realleged, and incorporated by reference herein.

336.  Through their actions, the FBI's investigative or law enforcement officers, including but not limited to Agent Christopher Jackson, initiated the prosecution of Mr. Houck without probable cause and with malice.

337.  Upon information and belief, from October 15, 2021, when the FBI's investigative or law enforcement officers received the video showing the interaction between Mr. Love and Mr. Houck, to January 30, 2023, when Mr. Houck was acquitted of all charges, the FBI's investigative and law enforcement officers committed tortious conduct in their investigation and communications with prosecuting authorities.

338.  FBI officers initiated a criminal proceeding when Agent Jackson intentionally, knowingly, and/or recklessly made or caused false statements and

representations and material omissions of facts in his reports, affidavits, and other communications with federal prosecutors.

339.   The criminal proceeding was initiated without probable cause. An indictment procured by fraud, perjury or other corrupt means, or when the agent knowingly and deliberately, or with a reckless disregard for the truth, makes materially false statements or omissions in the warrant application cannot serve as a basis for probable cause.

340.   The FBI's actions via its agents spanning from October 15, 2021, to January 30, 2023, resulted in the tort of malicious prosecution under the laws of the Commonwealth of Pennsylvania and violated Mr. Houck's rights guaranteed under the Fourth Amendment of the United States Constitution to be free from malicious prosecution.

341.   Under the Federal Tort Claim Act, Defendant United States of America is liable for these actions.

## COUNT II
### Plaintiff Mark Houck v. Defendant United States of America
### Federal Tort Claims Act – Retaliatory Prosecution

342.   All preceding paragraphs are repleaded, realleged, and incorporated by reference herein.

343.   Through their actions, the FBI's investigative or law enforcement officers committed tortious conduct in their investigation and communications with prosecuting attorneys.

344.   Upon information and belief, the FBI's officers initiated a criminal proceeding without probable cause when Agent Jackson intentionally, knowingly, and/or recklessly made or caused false statements and representations and material omission of facts in his reports, affidavits, and other communications with federal prosecutors based on impermissible motives including retaliation based on Mr. Houck's First Amendment-protected activities of standing vigil outside of the Planned Parenthood.

345.   Upon information and belief, the purpose of the prosecution was to punish and chill speech and religious exercise by Mr. Houck and other pro-life advocates and volunteers for pro-life clinics, which senior leadership at the Department of Justice viewed as "predatory," unworthy of FACE Act and constitutional protection, and indeed, necessary to punish.

346.   The FBI's actions via its agents spanning from October 15, 2021, to January 30, 2023, resulted in the tort of retaliatory prosecution under Pennsylvania law and further violated Mr. Houck's rights to be free from retaliation based on his rights under the First Amendment of the U.S. Constitution.

347.   Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## COUNT III
**Plaintiff Mark Houck v. Defendant United States of America**
**Federal Tort Claims Act – Abuse of Process**

348.   All preceding paragraphs are repleaded, realleged, and incorporated by reference herein.

349.   Upon information and belief, from October 15, 2021, to January 30, 2023, the FBI's investigative and law enforcement officers committed tortious conduct in their investigation and communications with prosecuting authorities when they used legal process against Mark Houck for an impermissible purpose.

350.   Upon information and belief, the FBI's officers improperly used a federal indictment under the FACE Act for the impermissible purpose of harassing and causing injury to Mr. Houck.

351.   Upon information and belief, the FBI's agents were aware of previous statements from the DOJ's Kristen Clarke calling pro-life pregnancy crisis centers "fake clinics" and "predatory." Ms. Clarke and Ms. Gupta's public statements directly contradicted the statements on the Civil Rights Division website and sent a clear message to all DOJ personnel about what the DOJ's real policy was: use the FACE Act against pro-life organizations.

352.   Upon information and belief, FBI personnel, including Special Agent Jackson, were all aware of the discriminatory policies and practices surrounding the enforcement of the FACE Act, and that the DOJ was targeting Mr. Houck to intimidate and disrupt the activities of pro-life counselors and pregnancy crisis centers.

353.   The FBI's decision to improperly investigate and seek a federal indictment under the FACE Act against Mr. Houck was to discourage Mr. Houck from continuing the exercise his First Amendment right to engage in speech and free exercise of his religion through prayer and work as a pro-life counselor and escort for a crisis pregnancy center.

354.   The actions of the FBI's officers resulted in the tort of abuse of process under Pennsylvania law and violated Mr. Houck's rights guaranteed under the First Amendment of the U.S. Constitution.

355.   Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

### Count IV
### Plaintiff Mark Houck v. Defendant United States of America
### Federal Tort Claims Act – False Arrest

356.   All preceding paragraphs are repleaded, realleged, and incorporated by reference herein.

357.   On September 23, 2023, the FBI officers, including Agent Jackson and other unnamed agents, falsely arrested Mr. Houck without probable cause.

358.   Upon information and belief, FBI investigative agents committed tortious conduct in their investigation and communication with prosecuting attorneys.

359.   Upon information and belief, the FBI's officers intentionally, knowingly, and/or recklessly made or caused false statements and representations and material omissions of facts in its reports, affidavits, and other communications with federal prosecutors.

360.   These actions led to the false arrest of Mr. Houck because no probable cause existed to support the indictment or subsequent warrant.

361.   The actions of the FBI's officers resulted in the tort of false arrest under Pennsylvania law and violated Mr. Houck's right to be free from unreasonable and unlawful seizure under the Fourth Amendment of the U.S. Constitution.

362.   Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

**Count V**
**All Plaintiffs v. Defendant United States of America**
**Federal Tort Claims Act – Assault**

363.    All preceding paragraphs are repleaded, realleged, and incorporated by reference herein.

364.    The FBI, through its agents' actions on September 23, 2022, in the arrest of Mr. Houck, committed the common law tort of assault when officers used unreasonable force under the circumstances to effectuate the arrest of Mr. Houck.

365.    Moreover, under the Fourth Amendment, Plaintiffs have constitutional rights to be "secure in [their] person[s], houses, papers, and effects, against unreasonable searches and seizures."

366.    Defendant deprived Plaintiffs of rights, privileges or immunities secured by the Constitution and laws of the United States, by using excessive force to arrest Mr. Houck on September 23, 2022.

367.    FBI agents intentionally attempted to harm Plaintiffs in their show of excessive and unreasonable force in Mr. Houck's arrest. FBI agents participated in Mr. Houck's arrest and were present at his home on September 23, 2022. FBI agents had guns drawn and pointed at Plaintiffs during Mr. Houck's arrest.

368.    Upon information and belief, FBI agents conspired and agreed before Mr. Houck's arrest to draw their weapons and aim them at Plaintiffs.

369.    Upon information and belief, based on what the FBI likely knew about Plaintiffs, the FBI knew or should have known that it would constitute excessive force to draw their weapons and aim them at Plaintiffs.

370.   The FBI knew or should have known that Mr. Houck had been charged with a non-violent crime.

371.   The FBI knew or should have known that Mr. Houck, Mrs. Houck, and their children did not pose an immediate threat to their safety or the safety of others during Mr. Houck's arrest.

372.   The FBI knew or should have known that Mr. Houck, Mrs. Houck, and their children had no criminal history or history of violence and had never threatened law enforcement officers.

373.   The FBI knew or should have known that Mr. Houck, his wife, and his children did not own a firearm.

374.   The FBI knew or should have known that Mr. Houck was willing to turn himself in if he was indicted and that Mr. Houck's attorney had offered to accept a summons on Mr. Houck's behalf in the event of an indictment.

375.   The force used in the seizure of Mr. Houck was unreasonable.

376.   Mr. Houck did not pose an immediate threat to the safety of the officers or others. Mr. Houck did not resist arrest or attempt to evade arrest by flight.

377.   Mr. Houck has no history of being violent or dangerous.

378.   Mr. Houck was not armed, nor was anyone living with him armed. Mr. Houck posed no threat to the FBI's exercise of authority or performance of the FBI's duty.

379.   The FBI's actions on September 23, 2022, resulted in the tort of assault under Pennsylvania law and violated Mr. Houck's rights to be free from excessive force under the Fourth Amendment of the U.S. Constitution.

380.   Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

### Count VI
**Plaintiffs Ryan-Marie Houck, M.H., A.M.H., K.H., T.H., J.H., A.H., and I.H.
v. Defendant United States of America
Federal Tort Claims Act – Intentional Infliction of Emotional Distress**

381.   All preceding paragraphs are repleaded, realleged, and incorporated by reference herein.

382.   The FBI, through its agent's actions on September 23, 2022, committed the common law tort of intentional infliction of emotional distress against Mrs. Houck and the Houck children when officers participated in extreme and outrageous conduct during the arrest of Mr. Houck.

383.   The FBI agents aimed loaded weapons at Mrs. Houck and the Houck children during the arrest of Mr. Houck.

384.    The FBI agents continued to aim their weapons at Mrs. Houck and the children even after Mr. Houck voluntarily stepped outside of his home after warning the officers to "stay calm" because he had "seven babies inside."

385.    The FBI agents intentionally intended to harm the entire Houck family with their actions that were wholly unnecessary based on what the FBI likely knew, or should have known, about the Houck family.

386.    The Houck family had no history of owning any weapons, no criminal history, and no history of violence, and they did not pose an immediate threat to the safety of others during the arrest.

387.    The FBI agents knew or should have known that Mrs. Houck and her children did not pose an immediate threat to their safety or the safety of others during Mr. Houck's arrest.

388.    The FBI agents knew or should have known that Mrs. Houck and her children did not have a criminal history or history of violence and had never threatened law enforcement officers.

389.    The FBI's actions through their agents were outrageous and utterly intolerable in a civilized community.

390.    These actions have caused severe emotional distress to Mrs. Houck and each of the Houck children.

391.    The FBI's actions on September 23, 2022, resulted in the tort of intentional infliction of emotional distress under Pennsylvania law against Mrs. Houck and each of the Houck children. These actions also violated Mrs. Houck and each of the Houck children's rights to be free from excessive force under the Fourth Amendment of the U.S. Constitution.

392.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

### COUNT VII
**Plaintiff Mark Houck v. Defendants Michael Rogers, Juan Barrios, Stephen Caputo, Brian Calabrese, Steve Johnson, Zack Brosius, and John Doe Defendants**
**42 U.S.C. § 1983 -- Excessive Force in Violation of the Fourth Amendment**

393.    All preceding paragraphs are repleaded, realleged, and incorporated by reference herein.

394.    Under the Fourth Amendment, Mr. Houck has the constitutional right to be "secure in his person, houses, papers, and effects, against unreasonable searches and seizures."

395.    Defendants, acting individually and in concert, deprived Mr. Houck of rights, privileges or immunities secured by the Constitution and laws by using excessive force to arrest him on September 23, 2022.

396.   The Fourth Amendment right to be free of excessive force in an arrest was clearly established at the time of Mr. Houck's arrest.  *See, e.g.*, *Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006).

397.   The right to be free of excessive force is the right to be free of force that is objectively unreasonable from the perspective of a reasonable officer.

398.   The seizure of Mr. Houck occurred when he was arrested on September 23, 2022.

399.   The seizure of Mr. Houck was objectively unreasonable.

400.   Mr. Houck had not been charged with a severe crime at the time of his arrest.  Mr. Houck has never been charged with a severe crime.

401.   Mr. Houck's attorney had offered to accept a summons on Mr. Houck's behalf in the event of an indictment.

402.   No law enforcement or governmental agencies made any effort to communicate with Mr. Houck or his counsel prior to his arrest and after the target letter.

403.   Mr. Houck did not pose an immediate threat to the safety of the officers or others.

404.   Mr. Houck did not resist arrest or attempt to evade arrest by flight.

405.   Mr. Houck has no history of being violent or dangerous.

406.   Mr. Houck was not armed.

407.   No one living with Mr. Houck was armed.

408.   Mr. Houck posed no flight risk, danger to himself, or to the community as evidenced by his release on his own recognizance.

409.   Mr. Houck's wife and seven children lived with Mr. Houck and were present during his arrest.

410.   Upon information and belief, Defendants pointed guns at Mr. Houck during his arrest, as they had agreed to do before arriving to arrest him.

411.   Mr. Houck's wife and children were behind Mr. Houck at the time of his arrest.  Upon information and belief, Mrs. Houck and at least some of Mr. Houck's children were in the line of fire from Defendants' guns.

412.   Defendants acted in their official capacities and under color of state law at all times during Mr. Houck's arrest on September 23, 2022, including at all times when they deprived Mr. Houck of rights, privileges, or immunities secured by the Constitution and laws.

413.   Defendants were motivated by evil motive or intent, or with reckless or callous indifference to the federally protected rights of Mr. Houck. No reasonable officer would have believed that this conduct was lawful.

414.   As a direct and proximate result of Defendants' excessive display and exercise of force, Mr. Houck has suffered compensable injury in the form of fear and distress, and pain and suffering.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Mark Houck, Ryan-Marie Houck, M.H., A.M.H, K.H., T.H., J.H., A.H., and I.H respectfully pray that this Court grant them the following relief:

A.  Order a jury trial on all issues so triable;

B.  Award Plaintiffs compensatory damages in excess of $150,000 as to Defendant United States;

C.  Award Plaintiff Mark Houck compensatory damages in excess of $150,000 pursuant to 42 U.S.C. § 1983 as to Defendants Michael Rogers, Juan Barrios, Stephen Caputo, Brian Calabrese, Steve Johnson, Zack Brosius, and unnamed John Doe Defendants.

D.  Award Plaintiff Mark Houck punitive damages pursuant to 42 U.S.C. § 1983 as to Defendants Michael Rogers, Juan Barrios, Stephen Caputo, Brian Calabrese, Steve Johnson, Zack Brosius, and unnamed John Doe Defendants;

E.  Award Plaintiffs reasonable costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

F.     Grant such other and further relief as the Court deems just and proper.

Dated: May 20, 2024                              Respectfully submitted,

| 40 DAYS FOR LIFE | GRAVES GARRETT GREIM LLC |
|---|---|
| */s/ Matthew Britton*<br>Matthew Britton, Va. Bar No. 39160*<br>4112 East 29th Street<br>Bryan, Texas 77802<br>Tel: (888) 543-3316<br>matt.britton@40daysforlife.com<br><br>* *pro hac vice* forthcoming<br><br>BOCHETTO & LENTZ, P.C.<br><br>*/s/ George Bochetto*<br>George Bochetto, PA Bar No. 27783<br>1524 Locust St,<br>Philadelphia, PA 19102<br>Tel: (215) 735-3900<br>gbochetto@bochettoandlentz.com | */s/ Todd P. Graves*<br>Todd P. Graves, Mo. Bar No. 41319*<br>Edward D. Greim, Mo. Bar No. 54034*<br>Katherine Graves, Mo. Bar No. 74671*<br>1100 Main Street<br>Suite 2700<br>Kansas City, Missouri 64105<br>Tel: (816) 256-3181<br>Fax: (816) 256-5958<br>tgraves@gravesgarrett.com<br>edgreim@gravesgarrett.com<br><br>* *pro hac vice* forthcoming<br><br>JAMES OTIS LAW GROUP, LLC<br><br>*/s/ Justin D. Smith*<br>Justin D. Smith, Mo. Bar No. 63253*<br>13321 North Outer Forty Road, Ste. 300<br>St. Louis, Missouri 63017<br>(816) 678-2103<br>Justin.Smith@james-otis.com<br><br>* *pro hac vice* forthcoming |