IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK HOUCK, *et al.*, : |  |
|          Plaintiffs, : |  |
| : |  |
|    v. : | Civ. No. 24-2151 |
| : |  |
| UNITED STATES OF AMERICA, *et al.*, : |  |
|          Defendants. : |  |

**Diamond, J.**                                                                                   February 14, 2025

**MEMORANDUM OPINION**

Plaintiff Mark Houck brings an excessive force claim against Pennsylvania State Troopers Michael Rogers and Juan Barrios for their role in Houck's arrest for violating the Freedom of Access to Clinic Entrances Act. (Doc. No. 46); 42 U.S.C. § 1983; U.S. Const. amend. IV; 18 U.S.C. § 248(a). I will grant Defendants' Motion to Dismiss because the excessive force claim is not plausible, and, in the alternative, because they are entitled to qualified immunity. (Doc. No. 51.)

**I.     FACTUAL ALLEGATIONS**

I recount here only the allegations pertinent to the Defendants' Motion.

As alleged, Houck was a volunteer at Philadelphia's Community Women's Center of America, a "crisis pregnancy center." (Doc. No. 46 ¶¶ 1, 34-36.) CWAC is located "slightly down the street" from a Planned Parenthood facility. (Id. ¶¶ 28, 34.) Houck, "who has deeply held convictions regarding the sanctity of unborn human life," "routinely conducted sidewalk counseling in which he compassionately engage[d] with pregnant women and their partners and, if they desire[d], escort[ed] them to the CWCA to receive reproductive health services." (Id. ¶¶ 27, 38.)

On October 13, 2021, Houck and his 12-year-old son were about 20 feet from CWCA. (Id.

1

¶¶ 57, 70.) As Houck and his son "approached two women standing on the same street corner as themselves and began to explain the reproductive health services available at the CWCA," Bruce Love—a Planned Parenthood escort—ran "nearly 100 feet" to "physically position[] himself between Mr. Houck and the women . . . [and] set a moving pick." (Id. ¶¶ 57, 70, 78.) Houck "inevitably and unavoidably made brief and inadvertent contact with Mr. Love's arm" at that time. (Id. ¶ 80.)

Houck and his son moved some 50 feet away from the Planned Parenthood entrance. (Id. ¶ 97.) Love "did not stay at his post in front of Planned Parenthood," but approached Houck and his son again, this time with no one else present, and "loudly verbally harass[ed]" them. (Id. ¶¶ 100-03.) Houck attempted to walk Love back toward Planned Parenthood, but Love "reversed course," and headed toward Houck's son. (Id. ¶¶ 120-23.) Houck "pushed Mr. Love away . . . to protect his son." (Id. ¶ 124.)

On April 27, 2022, after the Philadelphia Police Department "declined to pursue the incident," the U.S. Attorney's Office served Houck with a target letter, explaining that a federal grand jury was investigating whether he had violated the FACE Act. (Id. ¶¶ 145, 191); 18 U.S.C. § 248(a)(1). Houck's counsel "repeatedly attempted to reach the AUSA who signed the target letter," so he could convey an offer to accept a "summons" on Houck's behalf, but never received a response. (Doc. No. 46 ¶¶ 193-97.) On September 20, 2022, the grand jury charged Houck with two FACE Act violations, stemming from the October 13, 2021 incident. (Id. ¶ 202.)

On September 20, 2022, Magistrate Judge Lloret approved an arrest warrant for Houck. See United States v. Houck, 22-cr-00323 (E.D. Pa.), ECF Nos. 2, 5; (Doc. No. 51 Ex. 2); Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (district court may take judicial notice of a "matter of public record"). In the early morning hours of September 23, 2022, Houck was in his kitchen

when he heard loud pounding on the front door and shouts of "Police force!" and "Open the door!" (Doc. No. 46 ¶¶ 232-33.)  His seven children were asleep upstairs.  (Id. ¶ 232.)  Speaking through the still-closed door, Houck told the agents to "stay calm because he had seven babies inside."  (Id. ¶ 234.)  Once he opened the door, Houck saw "heavily armed federal, state, and local law enforcement surrounding his home and pointing rifles and pistols directly at him."  (Id. ¶ 236.)  Houck variously fixes the number from "over a dozen" officers to "at least 20."  (Doc. No. 56-1 at 15, 18.)

Pennsylvania State Troopers Rogers and Barrios were present.  (Doc. No. 46 ¶¶ 237, 287.)  The first officer to arrive at the Houck home, Barrios drove his police car to the front of Houck's driveway near the porch, followed immediately by Rogers, who pulled his car into the yard.  (Id. ¶ 242.)  Barrios and Rogers crouched behind their police cars and drew their weapons, aiming them at Houck when he came to the door.  (Id. ¶ 244.)  From an upstairs window, Mrs. Houck saw "federal, state, and local agents running all over her property and positioning themselves behind the vehicles."  (Id. ¶ 258.)   She saw "the officers aim their guns directly at the front porch, where Mr. Houck stood."  (Id. ¶ 259.)  Houck also saw that "his lawn and driveway were full of state and local law enforcement, crouching behind the doors of the vehicles" and that "[e]very single one of these agents had a pistol pointed directly at him."  (Id. ¶ 243.)

Houck stepped onto the porch and cooperated with the federal agents who, in "an overwhelming act of paramilitary force," arrested him.  (Doc. No. 56-1 at 5; Doc. No. 46 ¶¶ 5, 268.)  This took "several minutes," during which "the officers' guns remained pointed at him."  (Doc. No. 46 ¶ 268.)

During Houck's arrest, Rogers' vehicle dashcam recorded the conversation of two state agents, "one of whom was presumably Defendant Rogers."  (Id. ¶ 297.)  One officer said, "That is

3

unlike anything. I do all my s--- in Philly. That never happens." (Id.) The other said, "My only concern, really, was the schools in the morning. You saw the kids starting to come out." (Id.) They were concerned that Houck's children "could have been standing at the end of driveway," upon their arrival and one stated, "I don't want any kid to see this s---." (Id.)

Houck suggests that the FBI "would have briefed" Barrios and Rogers before the arrest, who thus "would have learned" that:

> [1] Mr. Houck did not pose an immediate threat to their safety or the safety of others during his arrest; [2] Mr. Houck had no criminal history or history of violence; [3] Mr. Houck had never threatened law enforcement officers; [4] Mr. Houck, his wife, and his children did not own a firearm; [5] Mr. Houck's wife and seven children lived with Mr. Houck and would be present during an arrest at the family home; [6] Mr. Houck was willing to and had offered to, through counsel, turn himself in if he was indicted; and [7] Mr. Houck was represented by counsel all at relevant times during the arrest.

(Id. ¶¶ 285-86, 290-96.)

## II. PROCEDURAL HISTORY

On January 30, 2023, after a five-day trial, the jury acquitted Houck of both charges. (Id. ¶ 282); see also Houck, 22-cr-00323, ECF No. 68. On May 20, 2024, Houck and his family filed a Complaint in this Court, with Houck alleging malicious prosecution, retaliatory prosecution, abuse of process, and false arrest claims against the United States under Federal Tort Claims Act, and a Section 1983 Fourth Amendment claim for excessive force against all the law enforcement officers involved in his arrest, including Barrios and Rogers. (Doc. No. 1); 28 U.S.C. § 1346; 42 U.S.C. § 1983. Houck and his family also included an assault claim under the FTCA; his wife and children brought a separate intentional infliction of emotional distress claim under the FTCA. (Doc. No. 1); 28 U.S.C. § 1346.

Barrios and Rogers moved to dismiss on qualified immunity grounds. (Doc. No. 35.) The United States also moved to dismiss for lack of jurisdiction and failure to state a claim. (Doc. No.

41.) Federal agents and federally deputized state police officers moved for summary judgment or, in the alternative, to dismiss for failure to state a claim. (Doc. No. 40.) Plaintiffs then filed the instant Amended Complaint, reasserting the original claims against the United States, but dropping all claims against the individual federal officers. (Doc. No. 46.) As in his original Complaint, Houck alleges that Barrios and Rogers used excessive force. (Id. ¶¶ 484-506.) Barrios and Rogers have again moved to dismiss, both for failure to state a claim and on qualified immunity grounds. (Doc. No. 51); Fed. R. Civ. P. 12(b)(6). The matter is fully briefed. (Doc. Nos. 51, 56.)

### III. LEGAL STANDARDS

#### A. Failure to State a Claim

Under Rule 12(b)(6), I must accept Plaintiffs' factual allegations as true, and disregard legal conclusions or mere elements recitations. Fowler v. PMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). I must then determine whether the allegations make out a "plausible" claim. Id. at 211. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

To state a claim under Section 1983, a plaintiff "must allege both a deprivation of a federally protected right and that this deprivation was committed by one acting under color of state law." Woloszyn v. Lawrence Cnty., 396 F.3d 314, 319 (3d Cir. 2005). The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991). Reasonableness "is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996).

### B. Immunity

Qualified immunity is "an immunity from suit rather than a mere defense to liability," so "it is effectively lost if a case is erroneously permitted to go to trial." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511 526 (1985)).

"A police officer is entitled to qualified immunity under § 1983 unless the plaintiff shows that the officer violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lozano v. New Jersey, 9 F.4th 239, 245 (3d Cir. 2021). "To decide if an officer is entitled to qualified immunity, [courts] use a two-prong test." Id.

> At the first prong, we ask if the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right." At the second prong, we "ask whether the right was clearly established," because "the contours of the right must be sufficiently clear such that the unlawfulness of the action [wa]s apparent in light of pre-existing law."

Id. (omission and alterations in original) (citations omitted). Courts "may address these two prongs in whichever order [is] appropriate for the case." Id. "[A] negative answer on either inquiry entitles a defendant to qualified immunity." Rivera-Guadalupe v. City of Harrisburg, 124 F.4th 295, 299 (3d Cir. 2024).

### IV. DISCUSSION

Defendants argue that Houck has not brought a plausible Fourth Amendment claim, and that they are entitled to qualified immunity, given their minimal role in Houck's arrest. (Doc. No. 51.) I agree.

### A. Fourth Amendment

Barrios and Rogers urge that their conduct as alleged was objectively reasonable and so did not violate the Fourth Amendment. (Doc. No. 51 at 9-21.) "Generally, a seizure is reasonable only where it is justified by a warrant or probable cause." Couden v. Duffy, 446 F.3d 483, 494 (3d

6

Cir. 2006). "The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." Id. at 496 (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). "The question in excessive force cases is whether, under the totality of the circumstances, 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Anglemeyer v. Ammons, 92 F.4th 184, 188 (3d Cir. 2024) (quoting Graham, 490 U.S. at 397).

Courts consider several factors in assessing the objective reasonableness of the "challenged conduct," including:

> [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight [as well as] [4] physical injury to the plaintiff, [5] the possibility that the persons subject to the police action are themselves violent or dangerous, [6] the duration of the action, [7] whether the action takes place in the context of effecting an arrest, [8] the possibility that the suspect may be armed, and [9] the number of persons with whom the police officers must contend at one time.

El v. City of Pittsburgh, 975 F.3d 327, 336 (3d Cir. 2020) (cleaned up); see also Graham, 490 U.S. at 396; Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

The scope of this inquiry is limited to the "challenged conduct" itself. See Couden, 446 F.3d at 496; Iqbal, 556 U.S. at 676; Lozano, 9 F.4th at 245-47. "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676; see also Lozano, 9 F.4th at 245-47. Such allegations "must be made with appropriate particularity." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Moreover, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances

7

confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397.

Accordingly, I must consider whether the conduct allegedly attributable to Barrios and Rogers during Houck's arrest constitutes excessive force. See Rode, 845 F.2d at 1207; Torres v. Madrid, 592 U.S. 306, 311 (2021) (arrest is the "quintessential 'seizure of the person'" under the Fourth Amendment). It does not.

Houck alleges that Defendants were part of the group of officers who sought to arrest him pursuant to a warrant. (Doc. No. 46 ¶ 242.) The first officers to arrive, Barrios and Rogers parked in Houck's driveway and front yard. (Id.) They crouched behind their cars and pointed their guns at Houck when he opened the front door. (Id. ¶¶ 243-44.) Both Houck and his wife saw that all the officers who crouched behind their vehicles were pointing their weapons at Houck. (Id. ¶¶ 243, 258-59.) Officers other than Barrios and Rogers effectuated the arrest within "minutes." (Id. ¶ 268.) There is no allegation that Barrios or Rogers interacted with Houck or with any other Plaintiff. (See id. ¶¶ 249-51, 268, 287-88.)

In these circumstances, the Defendants' conduct was objectively reasonable. Officers sought to effectuate a federal warrant to arrest Houck for two alleged FACE Act violations, felonies that would require the Government to prove, as alleged in the indictment, that Houck used "force" to "intentionally injure[], intimidate[], and interfere[] with" Love. (Id. ¶ 1; Doc. No. 51 Exs. 1, 2); 18 U.S.C. § 248(a)(1); Schmidt, 770 F.3d at 249. The offer from Houck's counsel to accept a "summons"—which the Government issues only when charging a summary offense—was beside the point. (Doc. No. 46 ¶ 196); Fed. R. Crim. P. 58(b)(1) (charging document for petty offense may be "citation or violation notice"); see also Luna-Reyes v. Att'y Gen., 826 F. App'x 178, 184 (3d Cir. 2020) (right to indictment by grand jury does not apply to a "petty offense").

8

The letter issued to Houck confirmed that he was a target of the grand jury, which is constitutionally required to charge felonies by indictment. U.S. Const. amend. V; see also Costello v. United States, 350 U.S. 359, 361-62 (1956). That Defendants crouched behind their cars confirms that they feared being shot. (Doc. No. 46 ¶ 242.) In any event, even accepting Houck's dubious allegation that Defendants must have known he had no criminal record and did not own a gun, they could not have known how he would react when he opened the door to the arresting officers. (Id. ¶ 286.) Nor could they know if anyone in or near the house was armed. (See id.)

Given Defendants' minimal role, Houck necessarily argues that the overall show of force was unreasonable: the number of agents effectuating the arrest, that Houck told them at his front door that his children were inside the house, and that officers pointed guns at Houck's wife and children. (Doc. No. 56-1 at 7-9.) These actions of other officers are not attributable to Defendants, however. See Rode, 845 F.2d at 1207. As to Barrios and Rogers, Houck alleges only that they were yards away, crouching behind their police vehicles and pointing their service weapons at Houck. (Doc. No. 46 ¶¶ 243-51.) Houck nonetheless urges that under Baker v. Monroe Twp. the "intrusiveness of all the aspects of the incident in the aggregate" can show the excessiveness of police use of force. 50 F.3d 1186, 1193 (3d Cir. 1995); (Doc. No. 56-1 at 10.) I do not agree. Baker addressed the supervisory liability of an officer in charge of a drug raid. 50 F.3d at 1190-91. As alleged here, the FBI oversaw Houck's arrest; State Troopers Barrios and Rogers had no supervisory role. (Doc. No. 46 ¶¶ 284-86.)

In the circumstances presented, Defendants' conduct—briefly pointing guns at Houck while he was arrested pursuant to a federal warrant—was objectively reasonable and so did not violate the Fourth Amendment. Because Houck's Section 1983 claim is thus implausible, I will dismiss it.

9

### B. Qualified Immunity

Barrios and Rogers argue that even if their conduct was not objectively reasonable, they are immune from suit because they did not violate a clearly established right of Houck's. (Doc. No. 51 at 21-27.) I agree, and so will dismiss on this alternative ground.

"An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' meaning that 'existing precedent . . . placed the statutory or constitutional question beyond debate.'" City & Cnty. of San Francisco v. Sheehan, 575 U.S. 600, 611 (2015) (omission and alteration in original) (citation omitted) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). This requires Houck to show more than that Barrios and Rogers knew that Houck had a clearly established right to be from the use of excessive force. "[T]he central question is whether the existing law gave the officer 'fair warning' that his *particular* conduct was unlawful." Jacobs v. Cumberland Cnty., 8 F.4th 187, 196 (3d Cir. 2021). "Such specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" Mullenix v. Luna, 577 U.S. 7, 12 (2015) (alteration in original) (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001)). The Supreme Court has further admonished that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396; see also Couden, 446 F.3d at 497 (courts consider "whether the action takes place in the context of effecting an arrest").

The Third Circuit has not explicitly held that it is always reasonable for police to draw their weapons whenever they make an arrest. This hardly means, however, that Defendants violated

10

Houck's "clearly established rights" when they drew their weapons during his arrest. See James v. N.J. State Police, 957 F.3d 165, 170 (3d Cir. 2020) ("'[C]learly established rights' are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'") Although controlling authority need not have "indistinguishable facts" from the instant case to establish a right clearly, "the right must be defined with a 'high degree of specificity'." Dennis v. City of Philadelphia, 19 F.4th 279, 288 (3d Cir. 2021).

No such right to be free from drawn weapons while being arrested has ever been defined with *any* specificity. Rather, the Third Circuit has set out a case by case rubric, holding that the "use of guns . . . must be justified by the circumstances." Baker, 50 F.3d at 1193. The Court has thus deemed excessive the police drawing their weapons in circumstances quite different from those alleged here. See, e.g., id. In Couden v. Duffy, four officers entered Couden's home without a warrant, "jumped on [her fourteen-year-old son], pointed guns at his head, handcuffed him, and sprayed him with mace." 446 F.3d at 497. In Baker v. Monroe Twp., the Baker family inadvertently visited a relative's home at the same time police were executing a drug raid. 50 F.3d at 1188. The Bakers were not under arrest, yet officers "pointed guns at them, pushed them down to the ground and handcuffed them." Id. at 1193. In Black v. Stephens, a plainclothes detective approached Black's car without identifying himself, called Black a "rotten driver," and pointed a gun at Black's head, with Mrs. Black clearly in the line of fire. 662 F.2d 181, 185 (3d Cir. 1981).

The Circuit's determinations that police force was not excessive are also different from those presented here. See Mellott v. Heemer, 161 F.3d 117, 119-21 (3d Cir. 1998) (Marshals effectuating an eviction pointed guns, included a pumped shotgun, in the faces of unarmed plaintiffs whom they had been warned had weapons); Sharrar v. Felsing, 128 F.3d 810, 821-22 (3d

11

Cir. 1997) (twenty officers, including a SWAT team with machine guns, required four domestic abuse suspects to "lie face down in the dirt, with guns to their heads and vulgar threats"); Carswell v. Borough of Homestead, 381 F.3d 235, 238 (3d Cir. 2004) (officer shot unarmed domestic abuse suspect who was running at him).

There is also no "robust consensus of cases of persuasive authority" from this Circuit or other Circuits that clearly establish Houck's right not to have police draw their weapons when arresting him pursuant to a valid warrant. James, 957 F.3d at 170. The cases Houck cites are factually distinguishable from this case and each other, with no consensus about drawn weapons that Barrios and Rogers should have followed. (Doc. No. 56-1 at 23-25); see also, e.g., Robinson v. Solano Cnty., 278 F.3d 1007, 1015 (9th Cir. 2002) (although drawn guns in *investigatory or Terry stops* are often unreasonable, the Court did not address execution of valid arrest warrants); Holland v. Harrington, 268 F.3d 1179, 1183-84 (10th Cir. 2001) (SWAT officers pointed weapons at the plaintiffs who were not under arrest during execution of search warrant); Saad v. Krause, 472 F. App'x 403, 403 (6th Cir. 2012) (officer pointed weapon at "an unarmed 78-year old woman who was not suspected of any crime and posed no threat to anyone's safety, while demanding entry to her home"); McNair v. Coffey, 279 F.3d 463, 467 (7th Cir. 2002) ("[E]xcessive number of squad cars or drawn guns [does not] violate the [F]ourth [A]mendment by giving fright or offense, if the seizure is supported by probable cause and otherwise reasonable.").

In these circumstances, Barrios and Rogers had nothing close to "'fair warning' that [their] *particular* conduct was unlawful." Jacobs, 8 F.4th at 196. Accordingly, they did not violate Houck's clearly established rights, and so are immune from Houck's excessive force claim.

## V.     CONCLUSION

Because Houck's constitutional claim is not plausible and because Barrios and Rogers are otherwise entitled to qualified immunity, I will grant their Motion to Dismiss.

An appropriate Order follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
Paul S. Diamond, J.