IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARK HOUCK,** *et al.*, : |  |
| Plaintiffs, : |  |
| : |  |
| v.   : | Civ. No. 24-2151 |
| : |  |
| **UNITED STATES OF AMERICA,** *et al.*, : |  |
| Defendants. : |  |

**Diamond, J.**                                                                                                          **March 6, 2025**

### MEMORANDUM OPINION

Mark Houck and his family proceed under the Federal Tort Claims Act against the United States. (Doc. No. 46.) The gravamen of their six count Amended Complaint is that federal agents used excessive force when they drew their weapons while arresting Houck, and that the Government wrongfully prosecuted him for violating the Freedom of Access to Clinic Entrances Act—resulting in his acquittal. (Id.); 18 U.S.C. § 248(a). Because Plaintiffs' claims are not plausible, I will grant the Government's Motion to Dismiss. (Doc. No. 49.)

### I.      FACTUAL ALLEGATIONS

Plaintiffs draw their allegations largely from Houck's indictment, his arrest warrant, and his criminal trial transcript. (Doc. No. 46 at 10-32, 44-49, 50-58); United States v. Houck, No. 22-cr-00323 (E.D. Pa.), ECF Nos. 1 [Indictment], 5 [Warrant], 64-68. Because Plaintiffs heavily rely on these materials in their pleading, I, too, may refer to them without converting the Government's dismissal motion into one for summary judgment. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) ("A 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" (alteration in original) (quoting Shaw v. Digit. Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996))).

1

In 2021, Houck, then 47 years old, was a volunteer at Community Women's Center of America, a crisis pregnancy center in Philadelphia. (Doc. No. 46 ¶¶ 1, 28, 34-36; Indictment at 2 of 4.) CWCA is located "slightly down the street" from a Planned Parenthood. (Doc. No. 46 ¶ 34.) Houck, "who has deeply held convictions regarding the sanctity of unborn human life," "routinely conducted sidewalk counseling, in which he compassionately engage[d] with pregnant women and their partners and, if they desire[d], escort[ed] them to the CWCA to receive reproductive health services." (Id. ¶¶ 27, 38.)

On October 13, 2021, Houck and his 12-year-old son stood some 20 feet from CWCA. (Id. ¶¶ 57, 70.) As Houck and his son "approached two women standing on the same street corner as themselves and began to explain the reproductive health services available at the CWCA," Bruce Love—a Planned Parenthood escort, then 72 years old—ran "nearly 100 feet" to "physically position[] himself between Mr. Houck and the women . . . [and] set a moving pick." (Id. ¶¶ 57, 70, 78; Indictment at 2 of 4.) Houck "inevitably and unavoidably made brief and inadvertent contact with Mr. Love's arm" and thus shoved Love to the ground. (Doc. No. 46 ¶ 80); Crim. Trial Tr. 163:13-19, Houck, No. 22-cr-00323 (E.D. Pa. Jan. 26, 2023), ECF No. 66.

Houck and his son moved 50 feet away from the Planned Parenthood entrance. (Id. ¶ 97.) Love "did not stay at his post in front of Planned Parenthood," but approached Houck and his son again, this time with no patients present, and "loudly verbally harass[ed]" them. (Id. ¶¶ 100-03.) Houck attempted to walk Love back toward Planned Parenthood, but Love "reversed course," heading back toward them. (Id. ¶¶ 120-23.) Houck then "forcefully shoved [Love] to the ground . . . causing injuries to [Love] that required medical attention." (Indictment at 4 of 4.)

As alleged, the FBI interviewed Houck, Love, and other witnesses about the October 13, 2021 incidents. (Doc. No. 46 ¶¶ 126-35.) The second incident was captured on video by Planned

2

Parenthood, which provided the recording to the FBI. (Id. ¶ 88.) Houck alleges that Planned Parenthood's cameras "should have recorded the First Incident," and that the FBI "unreasonably and purposely delayed" requesting the footage within the clinic's retention period. (Id. ¶¶ 86-94.) The FBI instead "relied on Mr. Love's biased testimony to prosecute Mr. Houck for the First Incident." (Id. ¶¶ 73, 94.)

On April 27, 2022, after Philadelphia authorities "declined to pursue the incident," the U.S. Attorney's Office served Houck with a target letter, stating that a federal grand jury was investigating whether he had violated the FACE Act. (Id. ¶¶ 145, 191); 18 U.S.C. § 248. Houck's counsel "repeatedly attempted to reach the AUSA who signed the target letter" so he could accept a "summons" on Houck's behalf, but received no response. (Doc. No. 46 ¶¶ 193-97.) On September 20, 2022, the grand jury charged Houck with two FACE Act violations, and Magistrate Judge Lloret approved an arrest warrant for Houck (which incorporated the indictment). (Id. ¶ 202; Indictment; Warrant); see also Houck, 22-cr-00323, ECF No. 2.

Plaintiffs allege that because the FBI purportedly conducted a "months-long investigation" of Houck, the Bureau necessarily "would have explored Mr. Houck and his background" and learned before his arrest "that Mr. Houck had no criminal history or history of violence . . . [and] that Mr. Houck, his wife, and his children did not own a firearm." (Doc. No. 46 ¶¶ 43, 286.)

In the early morning of September 23, 2022, Houck was preparing breakfast when he heard loud pounding on the front door and shouts of "Police force!" and "Open the door!" (Id. ¶¶ 232-33.) His children were asleep upstairs. (Id. ¶ 232.) Speaking through the door, he told the agents to "stay calm because he had seven babies inside." (Id. ¶ 234.) When he opened the door, Houck saw "five federal agents [standing] on his porch [some of whom] had AR-styled M-16 rifles pointed directly at [him]." (Id. ¶ 238.) These officers were equipped with "heavily armored vests,

3

ballistic helmets, and shields." (Id. ¶ 240.) Officers on the porch also carried a "battering ram" and a "crowbar," and another 10-15 officers—among them two state troopers—were positioned around the expansive Houck property, crouching behind their police cars with their weapons drawn. (Id. ¶¶ 239, 243-44, 323.)

Mrs. Houck "rushed down the stairs, which are less than five feet from the front door." (Id. ¶ 260.) A federal agent pointed his gun at her, while the Houck children sat on at the top of the stairs. (Id. ¶¶ 261-62.) "The federal agent followed [Mrs. Houck's] movements with the gun as she descended the stairs" to the door. (Id. ¶ 263.) Houck's nine-year-old daughter T.H. also "rushed to see what was happening" and saw two federal agents through the backdoor window, one of whom pointed his gun at her. (Id. ¶ 245.) "She screamed in terror." (Id.)

Houck was arrested within "several minutes" on his front porch. (Id. ¶¶ 246-50, 268.) "Even with Mr. Houck surrendered and in the officers' custody, the officers stayed within arms-length [sic] of [him] and other officers kept their rifles pointed directly at him." (Id. ¶ 251.) Mrs. Houck saw "agents across the property with their guns pointed directly at her and Mr. Houck." (Id. ¶¶ 263-64.) "The Houck children had begun to scream, gathering on the stairs just behind the front door and downrange of the firearms pointed at their parents." (Id. ¶ 267.) "Even though the agents saw and heard the children's screams, their guns remained fixed on Mr. and Mrs. Houck standing directly in front of the children." (Id.)

As alleged, Houck has lost unspecified speaking engagements and business opportunities, and his professional reputation was "tarnished," because of his arrest and prosecution. (Id. ¶¶ 307-08, 340-43.) He continues to suffer "severe anxiety," and so has installed a gate and security cameras to feel more secure at home. (Id. ¶¶ 319, 363.) Mrs. Houck has suffered three miscarriages from stress and is now infertile. (Id. ¶¶ 309, 360.) She has panic attacks when

4

"[un]announced visitors" come to the home.  (Id. ¶ 362.)  The Houck children have sleeping problems, including nightmares and somnambulism.  (Id. ¶¶ 327-29.)  Most take medication to sleep.  (Id. ¶¶ 373, 378, 387, 398, 408.)

## II.     PROCEDURAL HISTORY

On January 30, 2023, after a five-day trial, the jury acquitted Houck of both charges.  (Id. ¶ 282); see also Houck, No. 22-cr-00323, ECF No. 68.  On May 20, 2024, Houck and his family filed a Complaint in this Court.  (Doc. No. 1.)  Houck alleged malicious prosecution, retaliatory prosecution, abuse of process, and false arrest against the United States under the Federal Tort Claims Act, and a Section 1983 Fourth Amendment claim for excessive force against the officers involved in his arrest.  (Id.); 28 U.S.C. § 1346(b)(1); 42 U.S.C. § 1983.  Houck and his family also brought an FTCA assault claim against the officers, and his wife and children brought a separate FTCA claim for intentional infliction of emotional distress.  (Doc. No. 1); 28 U.S.C. § 1346(b)(1).

The two state troopers and all the federal officers separately moved to dismiss the Section 1983 claim.  (Doc. Nos. 35, 40); 42 U.S.C. § 1983.  The United States moved to dismiss for lack of jurisdiction and failure to state a claim.  (Doc. No. 41.)  Plaintiffs then filed the instant Amended Complaint, dropping the excessive force claim against the federal officers.  (Doc. No. 46.)  I have granted the state troopers' Motion to Dismiss the only claim Houck brought against them—excessive force.  (Doc. Nos. 66, 67.)

With the dropping of all the claims against the individual federal agents, the United States (the sole remaining defendant) has again moved to dismiss for lack of jurisdiction and failure to state a claim.  (Doc. No. 49); Fed. R. Civ. P. 12(b)(1), (6).  The matter is fully briefed.  (Doc. Nos. 49, 57, 60, 63.)

### III.     LEGAL STANDARDS

#### A.     Rule 12

A federal court must dismiss if it lacks subject matter jurisdiction.  Fed. R. Civ. P. 12(h)(3).  I must determine whether a Rule 12(b)(1) motion to dismiss for lack of jurisdiction "presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed."  Const. Party v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014).  "[A] facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), i.e., construing the alleged facts in favor of the nonmoving party."  Id. at 358.

Under Rule 12(b)(6), I must accept Plaintiffs' factual allegations as true, and disregard legal conclusions or mere elements recitations.  Fowler v. PMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  I must then determine whether the allegations make out a "plausible" claim.  Id.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

#### B.     Federal Tort Claims Act

The Act allows certain civil actions to proceed against the United States, providing threshold jurisdictional requirements are met.  See 28 U.S.C. § 1346(b); CNA v. United States, 535 F.3d 132, 141 (3d Cir. 2008).  "The FTCA operates as a limited waiver of the United States's sovereign immunity."  White-Squire v. USPS, 592 F.3d 453, 456 (3d Cir. 2010).  "[A]n FTCA claimant must show that the government act or omission, if committed by a private person, would breach an independent state law duty."  Bosco v. United States, 164 F. App'x 226, 229 (3d Cir. 2006).

A plaintiff may recover for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable." 28 U.S.C. § 1346(b)(1). A plaintiff may also recover for "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" if committed by an "investigative or law enforcement officer" of the United States. 28 U.S.C. § 2680(h). "[A]though not explicitly enumerated in the statute, retaliatory prosecution also falls within the intentional tort exception." Vanderklok v. United States, 868 F.3d 189, 202 n.13 (3d Cir. 2017). Federal prosecutors are not investigative or law enforcement officers under this exception, and so are immune from suit. See Adams v. Boden, No. 18-cv-4408, 2018 WL 5923448, at *3 (E.D. Pa. Nov. 9, 2018) (citing Moore v. United States, 213 F.3d 705, 710 (D.C. Cir. 2000)). Under Pennsylvania law, investigative officers who are "intimately involved with the criminal proceedings against [a defendant] from beginning to end" are proper defendants in a malicious prosecution action. Shoop v. Dauphin Cnty., 766 F. Supp. 1327, 1338 (M.D. Pa. 1991).

"[I]n the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." Brownback v. King, 592 U.S. 209, 217 (2021). "[W]here a plaintiff fails to plausibly allege an element that is both a merit element of a claim and a jurisdictional element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6). Or both." Brownback, 592 U.S. at 218 n.8.

### IV.    DISCUSSION

The United States moves to dismiss Plaintiffs' FTCA claims for lack of subject matter jurisdiction, or in the alternative, for failure to state a claim. (Doc. No. 49.) Under the FTCA, Plaintiffs must "plausibly allege that the 'the United States, if a private person, would be liable to

[them] under state law both to survive a merits determination under Rule 12(b)(6) and to establish subject-matter jurisdiction." Brownback, 592 U.S. at 218 (citing 28 U.S.C. § 1346(b)(1)). Because the Government presents a facial attack on jurisdiction, I must apply the same standard I would in considering a motion to dismiss under Rule 12(b)(6). Const. Party, 757 F.3d at 357.

Houck brings four FTCA claims: (1) malicious prosecution, (2) retaliatory prosecution, (3) abuse of process, and (4) false arrest. (Doc. No. 46 at 80-86.) Houck and his family also bring an FTCA assault claim. (Id. at 86-89.) Finally, Houck's wife and children bring an FTCA intentional infliction of emotional distress claim. (Id. at 89-91.)

As none of Plaintiffs' claims is plausible, I will dismiss the Amended Complaint. (Doc. No. 46.)

### A. Counts I, II, IV: Malicious Prosecution, Retaliatory Prosecution, and False Arrest

Houck alone brings these claims, alleging that the FBI wrongfully investigated, arrested, and prosecuted him. (Doc. No. 46 at 80-83, 85-86.) The Government argues that these claims necessarily fail because Houck has not made out a lack of probable cause. (Doc. No. 49 at 14-20.) I agree.

Under Pennsylvania law, malicious prosecution, retaliatory prosecution, and false arrest all require the plaintiff to show the absence of probable cause. Amicone v. Shoaf, 620 A.2d 1222, 1224 (Pa. Super. 1993); Alleyne v. Pirrone, 180 A.3d 524, 528 (Pa. Commw. Ct. 2018); Ray v. Chester Cnty. Prison Admin., No. 998 C.D. 2008, 2009 WL 9104604, at *4 (Pa. Commw. Ct. Feb. 19, 2009) (citing Hartman v. Moore, 547 U.S. 250, 265-66 (2006)). A grand jury indictment "constitutes prima facie evidence of probable cause to prosecute." Xi v. Haugen, 68 F.4th 824, 841 (3d Cir. 2023) (quoting Rose v. Bartle, 871 F.2d 331, 353 (3d Cir. 1989)). This presumption attaches "to the indictment and beyond." Goodwin v. Conway, 836 F.3d 321, 329 (3d Cir. 2016).

8

Houck was arrested pursuant to a warrant on September 23, 2022, three days after he was indicted. (See Doc. No. 46 ¶ 442; Indictment; Warrant.) The presumption of probable cause thus applies to both Houck's arrest and prosecution. See Goodwin, 836 F.3d at 329. Nonetheless, "that presumption may be rebutted by a plausible allegation that the indictment was procured by fraud, perjury, or other corrupt means." Xi, 68 F.4th at 841 (quoting Rose, 871 F.2d at 353). Houck has not met this burden.

Houck reasons that in light of his acquittal, the charges brought against him necessarily were the result of fraud and dishonesty. (See, e.g., Doc. No. 46 ¶ 85.) Notwithstanding that no FBI agents testified at his criminal trial, Houck nonetheless assumes they testified before the grand jury, where they must have lied to the grand jurors, as they lied to prosecutors throughout. (See, e.g., id. ¶ 69.) Houck thus alleges that FBI Agent Christopher Jackson "intentionally, knowingly, and/or recklessly made or caused false statements and representations and material omissions of facts in his reports, affidavits, and other communications with federal prosecutors." (Id. ¶ 421.) Yet, Houck attributes no actual false statement to Jackson. (See id. ¶¶ 418-31, 441-47.) Similarly, Houck alleges that his arrest and prosecution were initiated without probable cause because "[t]he smattered lies throughout the grand jury indictment demonstrate that the indictment was procured by fraud, perjury, or other corrupt means." (Id. ¶ 422.) Once again, however, Houck nowhere identifies *any* "smattered lie" by *any* FBI agent or any other federal officer. (See id. ¶¶ 201-29.) Rather, Houck deduces that:

> The only way the false statements in the indictment could have been adopted by the grand jury is by the malicious presentation of false or misleading facts and instructions or the concealment of critical and material information.

(Doc. No. 46 ¶ 223.) This is not adequate. Houck must allege more than that he was charged only because federal agents concealed unidentified evidence from prosecutors and made unspecified

9

false statements to the grand jury.  See Lewis v. City of New York, No. 12-2836, 2013 WL 6816615, at *9 (E.D.N.Y. Dec. 24, 2013) (plaintiff must allege specific facts concerning the "form or substance of the evidence or information he claims [Defendants] fabricated"); see also Abdul-Rahman v. City of New York, No. 10-2778, 2012 WL 1077762, at *12 (E.D.N.Y. Mar. 30, 2012) (malicious prosecution claim dismissed where plaintiff alleged that defendant police officers offered false statements to the grand jury, but not what the false statements were).

Although Houck alleges six purported "fraudulent statements that the FBI made to the grand jury and/or prosecutors," that list includes no statements actually made by an FBI agent. (See Doc. No. 57-1 at 10-11.)  Rather, Houck quotes from the indictment, in which he believes the grand jury mischaracterized the October 13, 2021 incidents.  (Id.)  Relying on Xi v. Haugen, he argues that this "independently demonstrates the FBI's provision of false information to overcome the presumption of probable cause."  (Id. at 11); 68 F.4th 824.  It does not.  In fact, Xi shows just the opposite.  There, the plaintiff alleged "seven discrete instances of [an FBI agent] intentionally, knowingly, and/or recklessly providing false information that led to Xi's prosecution."  68 F.4th at 841.  Houck's deduction that the only way he could have been indicted is through FBI fraud is far from the "detailed allegations" alleged in Xi.  See id.  Although I must accept all Houck's allegations as true, I may not "fill this gap in [Houck's] pleading with speculation."  Id.; see also Savino v. City of New York, 331 F.3d 63, 73 (2d Cir. 2003) (plaintiff must rebut the probable cause presumption with more than "mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991)).

Houck thus has not made out that his indictment was based on FBI fraud, perjury, or other corrupt means.  Because he has failed to rebut the presumption of probable cause, his malicious

10

prosecution, retaliatory prosecution, and false arrest claims are not plausible and will be dismissed. See Palma v. Atlantic Cnty., 53 F. Supp. 2d 743, 757 (D.N.J. 1999) (to survive a motion to dismiss, Plaintiff's allegations must be "sufficiently specific to overcome the presumption of grand jury regularity").

In the alternative, I conclude that Houck's FTCA retaliatory prosecution claim fails because he alleges that "[t]he purpose of the prosecution was to punish and chill speech and religious exercise by Mr. Houck and other pro-life advocates and volunteers for pro-life clinics." (Doc. No. 46 ¶ 429.) This claim is thus based on a violation of Houck's First Amendment rights, not state law. (See id.) The Supreme Court has held, however, that constitutional tort claims are not cognizable under the FTCA. FDIC v. Meyer, 510 U.S. 471, 477-79 (1994) ("By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right."); Bosco, 164 F. App'x at 229 ("[A]n FTCA claimant must show that the government act or omission, if committed by a private person, would breach an independent *state law duty*." (emphasis added)).

Accordingly, for this reason as well, Houck's FTCA retaliatory prosecution claim, based on an alleged violation of his First Amendment rights, is not plausible, and I will dismiss it.

### B. Count III: Abuse of Process

The Government argues that I must dismiss this claim because Houck fails to allege that the FBI "used any [legal] process 'for a purpose other than that for which the process was designed.'" (Doc. No. 49 at 24-27 (quoting McGee v. Feege, 535 A.2d 1020, 1026 (Pa. 1987)).) The Government is correct.

"[A]buse of process is defined as 'the use of legal process against another primarily to accomplish a purpose for which it is not designed.'" Keim v. Cnty. of Bucks, 275 F. Supp. 2d 628,

11

634 (E.D. Pa. 2003) (quoting Werner v. Plater-Zyberk, 799 A.2d 776, 785 (Pa. Super. Ct. 2002)). To establish a claim of abuse of process, a plaintiff must show that the defendant "(1) used a legal process against the plaintiff; (2) primarily to accomplish a purpose for which the process was not designed, and (3) that harm was caused to the plaintiff as a result." Id. at 635. Under Pennsylvania law,

> [i]t is not enough that the defendant had bad or malicious intentions or that the defendant acted from spite or with an ulterior motive. Rather, there must be an act or threat not authorized by the process, or the process must be used for an illegitimate aim such as extortion, blackmail, or to coerce or compel the plaintiff to take some collateral action.

Lower Bucks Cnty. Joint Mun. Auth. v. Koszarek, 244 A.3d 54, 72 (Pa. Commw. Ct. 2020) (quoting Al Hamilton Contracting Co. v. Cowder, 644 A.2d 188, 192 (Pa. Super. Ct. 1994)). "There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." Id.

Moreover, abuse of process is not concerned with the "wrongful initiation of . . . process," only with "perversion of process after litigation has begun." Gebhart v. Steffen, 574 F. App'x 156, 160 (3d Cir. 2014); Rosen v. Am. Bank, 627 A.2d 190, 192 (Pa. Super. Ct. 1993). "[O]nce the process is issued, the only thing that is important is the purpose for which it is used." Jennings v. Shuman, 567 F.2d 1213, 1218 (3d Cir. 1977) (citing Weiss v. Hunna, 312 F.2d 711 (2d Cir. 1963)).

Houck has not made out abuse of process. First, any action taken to initiate legal proceedings sounds in malicious prosecution, not abuse of process. See Rosen, 627 A.2d at 192 ("Malicious use of civil process has to do with the wrongful initiation of such process, while abuse of civil process is concerned with a perversion of a process after it is issued."). Accordingly, in so far as Houck alleges that FBI agents "committed tortious conduct in their investigation" or "[sought] an indictment" to "discourage and prevent Mr. Houck from continuing to exercise his

First Amendment right[s]," he fails plausibly to allege abuse of process. (Doc. No. 46 ¶¶ 433, 437); Gebhart, 574 F. App'x at 160; Rosen, 627 A.2d at 192; see also Keim, 275 F. Supp. 2d at 635 (no abuse of process for actions taken before criminal proceedings).

Second, once legal process has been initiated, the initiator must then use the process primarily to accomplish an improper purpose. Rosen, 627 A.2d at 192. Although Houck alleges that the FBI intended his arrest and indictment to chill his pro-life activism, the agents' motivation does not figure in this analysis. (Doc. No. 46 ¶¶ 434-37); Koszarek, 244 A.3d at 72 ("It is not enough that the defendant had bad or malicious intentions or that the defendant acted from spite or with an ulterior motive.") Houck must allege some improper "act or threat" springing from the legal process itself. Dietrich Indus., Inc. v. Abrams, 455 A.2d 119, 125 (Pa. Super. Ct. 1982) ("Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of process, is required." (quoting Di Sante v. Russ Fin. Co., 380 A.2d 439, 441 (Pa. Super. Ct. 1977))); Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 306 (3d Cir. 2003) ("The usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it." (quoting Restatement (Second) of Torts § 682 cmt. b (Am. L. Inst. 1965)).

Houck has not alleged any action from the FBI other than the continuation of his criminal prosecution. (See Doc. No. 46 ¶ 438 (alleging only that the "FBI continued to participate" in his prosecution)); Koszarek, 244 A.3d at 72 ("There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.").

Accordingly, because Houck has not plausibly alleged abuse of process, I will dismiss this claim.

### C. Count V: Assault

The Houcks allege that the FBI assaulted all Plaintiffs "when officers used unreasonable force under the circumstances to effectuate the arrest of Mr. Houck." (Doc. No. 46 ¶ 449.) Under Pennsylvania law, a police officer is privileged to commit the tort of assault "to prevent interference with the exercise of his authority or the performance of his duty." Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994). "In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest." Id. The Government argues that the force used here was reasonable. (Doc. No. 49 at 28-30.) I agree.

"[A] free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1986). The Pennsylvania and federal constitutional protections against excessive force are coextensive. Jones v. City of Philadelphia, 890 A.2d 1188, 1206 (Pa. Commw. Ct. 2006). My analysis:

> requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

Graham, 490 U.S. at 396. "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" Id. (omission and second alteration in original) (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).

The Houcks assert that the general "level of force" used to effectuate Houck's arrest was "extreme and unjustified," noting the number of officers and the equipment they brought. (Doc. No. 46 ¶¶ 237, 239-41; Doc. No. 57-1 at 29-30.) Without more, however, the Houcks have not made out that the level of force was unreasonable. See McNair v. Coffey, 279 F.3d 463, 467 (7th

14

Cir. 2002) ("Plaintiffs have not cited even one post-Graham decision holding that an excessive number of squad cars or drawn guns can violate the [F]ourth [A]mendment by giving fright or offense, if the seizure is supported by probable cause and otherwise reasonable. At least two . . . hold that a simple display of force along these lines does not violate the [F]ourth [A]mendment.") (citing Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997))). Even the "decision to employ a [heavily-armed] team" may be "objectively reasonable" if supported by the circumstances. See Est. of Smith v. Marasco, 430 F.3d 140, 149 (3d Cir. 2005). Here, five agents stood on Houck's porch, with "heavily armored vests, ballistic helmets, and shields," a "battering ram," and "crowbar." (Doc. No. 46 ¶¶ 238-43, 277.) Like the other agents positioned around the property, the five were there to effectuate a felony arrest warrant. (Id.) That agents arrested Houck in minutes and without incident does not make their precautions unreasonable. (Id. ¶ 268); see also McNair, 279 F.3d at 467.

The Houcks also argue that federal agents violated the Fourth Amendment when they "had guns drawn and pointed at" Houck. (Doc. No. 46 ¶¶ 452, 455; Doc. No. 57-1 at 30-31.)  I have already ruled that the two state troopers pointing their guns at Houck during his arrest was not unreasonable. (Doc. No. 66 at 6-9.) As I stated:

> [E]ven accepting Houck's dubious allegation that Defendants must have known he had no criminal record and did not own a gun, they could not have known how he would react when he opened the door to the arresting officers. Nor could they know if anyone in or near the house was armed.

(Id. at 9 (citations omitted).)  Moreover, that agents wore protective gear, carried shields, and crouched behind their police vehicles confirms that they feared being shot. (Id.) The agents sought to execute a warrant charging Houck with crimes requiring proof that he used "force" to "intentionally injure[], intimidate[], and interfere with" Love. (Indictment; Warrant.) Counsel's willingness to accept a "summons" on Houck's behalf was thus beside the point. (Doc. No. 46 ¶

15

196.) The agents were not going to cite Houck for a petty or summary offense, which may be initiated by summons. See Fed. R. Crim. P. 58(b)(1) (charging document for summary offense may be "citation or violation notice"); see also Luna-Reyes v. Att'y Gen., 826 F. App'x 178, 184 (3d Cir. 2020) (right to indictment by grand jury does not apply to a "petty offense"). In these circumstances, Defendants' conduct—briefly pointing guns at Houck while he was arrested pursuant to a federal warrant—was objectively reasonable and so did not violate the Fourth Amendment.

Finally, the Houcks argue that agents violated the Fourth Amendment when: (1) T.H. "rushed to see what was happening" and an agent "pointed [a gun] at her through the back door windows"; (2) an agent "extend[ed] his gun across the threshold of the door in the direction of [the Houcks'] young children clustered at the top of the stairs" "even before he spotted Mrs. Houck or any adults"; (3) a federal agent "pointed [a] gun directly at" Mrs. Houck and "followed her movements with the gun as she descended the stairs," keeping "his gun fixed on her as she came to the door to join her husband"; and (4) "agents across the property" kept their guns "pointed directly at [Mr. and Mrs. Houck]" in the doorway of their home while the Houck children were "gather[ed] on the stairs just behind the front door and downrange of the firearms pointed at their parents." (Doc. No. 46 ¶¶ 245, 261-64, 267, 452-55; Doc. No. 57-1 at 30.)

The Supreme Court has admonished courts to evaluate the reasonableness of police actions in the real-world circumstances police must confront, often involving hazardous, rapidly changing events:

> With respect to a claim of excessive force, the same standard of reasonableness at the moment applies . . . [t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

See Graham, 490 U.S. at 396-97.  The Third Circuit has similarly observed that "the government has a strong interest in ensuring that police are not forced to subject themselves to unreasonable danger while carrying out their duties." Stiegel v. Peters Twp., 600 F. App'x 60, 66 (3d Cir. 2014).

Once again, the agents at the Houck residence obviously were concerned that they might get shot.  (See Doc. No. 46 ¶¶ 240, 243.)  Keeping their weapons drawn until the property was secure was thus not unreasonable.  To the contrary, no court has found excessive force was used because officers temporarily pointed their guns while securing a residence in the execution of a warrant.  See L.A. Cnty. v. Rettele, 550 U.S. 609, 614 (2007) ("In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search."); Woods v. Keiffer, 610 F. App'x 416, 417 (5th Cir. 2015) ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." (quoting Rettele, 550 U.S. at 615)); McNair, 279 F.3d at 467.  The Houcks have not cited any contrary authority.  (See Doc. No. 57-1 at 30-33.)  Rather, the authority they offer is largely inapposite.  (See id.); cf. Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995) (excessive force to draw guns on and handcuff members of the family of an arrestee); Anglemeyer v. Ammons, 92 F.4th 184, 189-192 (3d Cir. 2024) (excessive force used when family members of an arrestee are "struck," "hit," "strangled," "attack[ed]," "[taken] down," and "dropped to the floor"); see also Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005) (en banc) (finding excessive force where officer trained a firearm on an infant for an extended period); Holland v. Harrington, 268 F.3d 1179, 1192-93 (10th Cir. 2001) (finding excessive force where officers "continu[ed] to hold the children directly at gunpoint after the officers had gained complete control of the situation"); McDonald v. Haskins, 966 F.2d 292, 294-95 (7th Cir. 1992) (finding excessive force where officer held a gun to the head of a nine-year-old child and threatened to pull

the trigger while the child's home was searched).

Because the Houcks thus have not plausibly alleged that federal agents used unreasonable force, their assault claim fails and will be dismissed.

### D.     Count VI: Intentional Infliction of Emotional Distress

Houck's wife and children base this claim on federal agents "storm[ing] the Houck property" and "aim[ing] loaded weapons at Mrs. Houck and the Houck children during the arrest of Mr. Houck."  (Doc. No. 46 at ¶¶ 469-83.)  The Government argues that an arrest pursuant to a valid warrant cannot form the basis of an IIED claim.  (Doc. No. 49 at 30-31.)

I note first that this claim falls within the FTCA's waiver of sovereign immunity so long as it does not "arise out" of an intentional tort enumerated in Section 2680.  28 U.S.C. § 2680(h); Shahen v. United States, No. 21-2039, 2023 WL 1805828, at *2 n.3 (E.D. Pa. Feb. 6, 2023).  The Government does not contend that it is immune.  (See Doc. No. 49 at 30-31.)

To make out IIED, the Houcks must show:

> (1) that [a tortfeasor's] conduct was extreme and outrageous, (2) that his conduct caused a person severe emotional distress, and (3) that he acted intending to cause that person such distress or with knowledge that such distress was substantially certain to occur.

Brown v. Muhlenberg Twp., 269 F.3d 205, 218 (3d Cir. 2001) (citing Restatement (Second) of Torts § 46); see also Britt v. Chestnut Hill Coll., 632 A.2d 557, 561 (Pa. Super. Ct. 1993).  "It is for the court to determine, in the first instance, whether the actor's conduct can reasonably be regarded as so extreme and outrageous as to permit recovery."  McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 661 (Pa. Super. Ct. 2000).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Buczek v. First Nat. Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987).

The Houcks have not shown that officers acted beyond all possible bounds of decency when they arrived in force and aimed weapons at Plaintiffs during Houck's arrest. (Doc. No. 46 ¶¶ 471-75.) As I have discussed, the agents plainly believed that in executing the arrest warrant, they could get shot. (Doc. No. 46 ¶¶ 240, 243.) In seeking to support their allegation of outrageousness, Plaintiffs once again rely on inapposite authority. They offer a decision where police subjected an already detained person to violence. (See Doc. No. 57-1 at 34); Garey v. Borough of Quakertown, No. 12-799, 2012 WL 3562450, at *1 (E.D. Pa. Aug. 20, 2012) (arrestee tased while detained in a police car). They offer other decisions involving police use of force far more serious than that challenged here. (See Doc. No. 57-1 at 34-35); Rosembert v. Borough of E. Lansdowne, 14 F. Supp. 3d 631, 637 (E.D. Pa. 2014) (compliant arrestee beaten, tased, and pistol whipped); Clair v. Borough of New Brighton, No. 16-667, 2016 WL 4396171, at *4 (W.D. Pa. Aug. 18, 2016) (neighbor of domestic abuse victim was "assaulted, tased, detained, humiliated, and brutalized"); Kokinda v. Breiner, 557 F. Supp. 2d 581, 586 (M.D. Pa. 2008) ("tearing," "popping," and possibly breaking the arm of a homeowner whose property a suspect had possibly entered). Once again, the pointing of guns while effectuating an arrest—especially where no plaintiff was injured—is not unreasonable, and so falls far short of outrageousness. McNair, 279 F.3d at 467; Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010) ("Police officers doing their job by arresting people when they have probable cause to do so certainly falls far short of extreme or outrageous conduct.").

Plaintiffs also argue that Mrs. Houck and the children suffered emotional distress from "mere[ly] witness[ing]" Houck's arrest. (Doc. No. 57-1 at 35.) Pennsylvania law provides that a plaintiff who suffers severe emotional distress when witnessing outrageous conduct directed at a family member may bring a claim for IIED, regardless of whether the family member is injured.

19

See Johnson v. Caparelli, 625 A.2d 668, 671 (Pa. Super. Ct. 1993). The conduct must be outrageous, however. See id. I have already ruled that the agents' conduct in arresting Houck was reasonable. That same conduct does not become outrageous because it was witnessed by the Houck family. See Est. of Paone v. Plymouth Twp., No. 22-2178, 2024 U.S. Dist. LEXIS 225700, at *22 (E.D. Pa. Dec. 13, 2024) ("[T]he Officers acted within the bounds of the law, so their conduct was not extreme and outrageous.")

Accordingly, the IIED claim is not plausible and I will dismiss it.

### V. CONCLUSION

Plaintiffs' Amended Complaint—some 100 pages long with over 500 paragraphs—generates considerably more heat than light. Plaintiffs' indignation is not a substitute for plausibility, however. Because none of Plaintiffs' claims is plausible, I will grant the United States' Motion to Dismiss.

An appropriate Order follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
Paul S. Diamond, J.